UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEF TRADING, LLC,

     Plaintiff,

v.                                  Case No. _____

FLORIDA BANCSHARES, INC. and
FIRST NATIONAL BANK OF PASCO
as nominal defendants and ANDER PLATT
GIBBS, JOHN HENSON, PAUL MIDILI,
ERNEST PEEPLES, MARLENE MANN,
STEVEN CARLE, AND PAULA S. O'NEIL,

     Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiff, DEF Trading, LLC, through undersigned counsel, sues Florida Bancshares, Inc. and First National Bank of Pasco as nominal defendants, and defendants Ander Platt Gibbs, John Henson, Paul Midili, Ernest Peeples, Marlene Mann, Steven Carle, and Paula S. O'Neil and states:

## NATURE OF THE ACTION

1.     By this action, Plaintiff seeks equitable relief and monetary damages in excess of $3,000,000 excluding interest, costs and attorney fees, arising out of (i) the decision of the board of directors and of each nominal defendant to continue providing banking and payment processing services to merchants engaged in the sale

and distribution of cannabis, without having in place the personnel and protocols necessary to ensure compliance with rigorous federal reporting guidelines, including the Bank Secrecy Act, resulting in an OCC enforcement action; (ii) acting in their own self-interest to the detriment of the nominal defendants by amending the bylaws of Florida Bancshares, Inc. in order to thwart a shareholder vote to remove them as directors, and (iii) other breaches of fiduciary duty as detailed herein.

## THE PARTIES

2.      Plaintiff DEF Trading, LLC ("DEF") is a Delaware limited liability company, with its principal place of business in London, England. DEF has one member, who is a US Citizen and resident of Texas.

3.      Nominal Defendant Florida Bancshares, Inc. ("Bancshares") is a Florida corporation with its principal place of business in Pasco County, Florida.

4.      Nominal Defendant First National Bank of Pasco ("Bank") is a national banking association within the meaning of 12 U.S.C. § 1813(q) with its principal place of business in Pasco County.

5.      Upon information and belief, Bancshares is the ultimate beneficial owner of 100% of the stock in the Bank.

6.      Defendant Ander Platt Gibbs ("Gibbs") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to Bancshares April 4, 2025 Annual Meeting of

83723344;3

Shareholders Proxy Statement ("Proxy Statement"), Gibbs is an attorney, 85 years old and is eligible for reelection in 2026. According to the website of Gibbs & Parnell, P.A., Gibbs is a retired personal injury and wrongful death attorney.

7.      Defendant John Henson (Henson") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to the Proxy Statement, Henson is a CPA, 77 years old, and was elected to a 3-year term in 2025.

8.      Defendant Paul Midili ("Midili") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to the Proxy Statement, Midili is in "insurance, real estate, agriculture," is 88 years old and is eligible for reelection in 2027.

9.      Defendant Ernest Peeples ("Peeples") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to the Proxy Statement, Peeples is a Citrus Grower, is 87 years old and is eligible for reelection in 2027.

10.     Defendant Marlene Mann ("Mann") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to the Proxy Statement, Mann is a retired office manager, dental assistant and registered nurse, is 81 years old, and is serving a 3-year term.

83723344;3

11.     Defendant Steven Carle ("Carle") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. According to the Proxy Statement, Carle is an attorney, is 80 years old, and is eligible for reelection in 2026. According to the website of Hodges and Carle, P.A., Carle's practice concentrates on wills, trusts and estates.

12.     Defendant Paula S. O'Neil ("O'Neil" and together with Gibbs, Henson, Midili, Peeples, Mann and Carle, the "Director Defendants") is a member of the board of directors of both Bancshares and Bank, and, upon information and belief, resides in Pasco County, Florida. O'Neil is also the current President and Chief Executive Officer of Bank. According to the Proxy Statement, O'Neil is the retired Pasco County Clerk of Court, is 68 years old and is serving a 3-year term.

13.     This Court has diversity jurisdiction pursuant 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interests and costs, and because there exists complete diversity amongst Plaintiff and the Defendants.

## CANNABIS RELATED BANKING

14.     Marijuana is classified as a Schedule 1 drug under the federal Controlled Substances Act, 18 U.S.C. § 801 *et. seq.* Accordingly, and despite some state laws to the contrary, it is illegal to possess, use, buy, sell or cultivate marijuana.

15.     Pursuant to the Bank Secrecy Act, 31 U.S.C. § 5311, *et. seq.* ("BSA"), implemented in part to combat money laundering, banks are obligated to file a

83723344;3

Suspicious Activity Report ("SAR") when it suspects illegal activity. Because the sale of marijuana is an illegal activity, banks are obligated to file SAR's when providing banking services to parties engaged in or related to, growing, distributing or selling cannabis.

16.      On February 14, 2014, the Department of Treasury, Financial Crimes Enforcement Network (FinCEN"), published guidance to the banking industry. The guidance, FIN-2014-G001, entitled BSA Expectations Regarding Marijuana-Related Business, relies upon guidance by published by U.S. Department of Justice Deputy Attorney General James M. Cole and is generally referred to as the "Cole Memo." While the Cole Memo was rescinded in January 2018, the rescission did not invalidate the FinCen guidelines and restrictions that are based upon the Cole Memo and which remain in effect today.

17.      The FinCEN guidance, a copy of which is attached hereto as **Exhibit A,** and the Cole Memo upon which it relies, impose requirements on banks offering services to any party engaged in the cannabis business. According to the guidance, before providing such services, the bank should conduct customer due diligence, including:

      a.   verifying with the appropriate state authorities whether the business is duly licensed and registered;

      b.   reviewing the license application (and related documentation) submitted by the business for obtaining a state license to operate its marijuana-related business;

    c.  requesting from state licensing and enforcement authorities available information about the business and related parties;

    d.  developing an understanding of the normal and expected activity for the business, including the types of products to be sold and the type of customers to be served (e.g., medical versus recreational customers);

    e.  ongoing monitoring of publicly available sources for adverse information about the business and related parties;

    f.  ongoing monitoring for suspicious activity, including for any of the red flags described in this guidance; and

    g.  refreshing information obtained as part of customer due diligence on a periodic basis and commensurate with the risk.

18.    Additionally, the Cole Memo and FinCen guidance specify a bank's obligation to file SAR's and defines three types of reports, a "Marijuana Limited SAR Filing," a "Marijuana Priority SAR Filing," and a "Marijuana Termination SAR Filing."

19.    In or about 2022, the Bank, through its Board of Directors, decided to solicit cannabis related banking business. Specifically, the Bank offered ACH payment processing services to merchants and third-party processors in cannabis related businesses.

20.    Pursuant to the allegations contained in a sworn Verified Complaint in the U.S. Alliance Lawsuit (defined below),[1] the Bank, through its Director

---

[1] Verified First Amended Complaint for Damages, Declaratory Relief, and Injunctive Relief in the matter *U.S. Alliance Group, Inc. et. al. v. First National Bank of Pasco, et. al.,* Case No. 8:25-

83723344;3

Defendants, "held themselves out . . . as experienced in the cannabis electronic payments industry and touted Pasco Bank as the first federally regulated bank in the United States to provide loans to companies operating in the cannabis industry," "represented that they could adequately onboard, process, and settle ACH transactions" for cannabis related merchants and third party processors.

21.     The Bank signed a series of processing agreements with U.S. Alliance Group, Inc. and its affiliate, Payment Solutions International, LLC, by which the Bank agreed to process cannabis related transactions. The relevant ACH Cannabis Related Business Origination Agreements are attached as Exhibits A and B to the Verified Complaint in the U.S. Alliance Lawsuit.

22.     Upon information and belief, the Bank did not have officers, directors, personnel or protocols with sufficient relevant knowledge and experience to ensure compliance with the complicated regulations to provide cannabis related banking business.

23.     Accordingly, upon information and belief, in or around 2024 and 2025, the OCC began an investigation into the Bank's cannabis related business.

24.     As part of that investigation, the "Bank's primary regulator had demanded that the Bank obtain a third-party lookback to determine the scope and

---

01458-SDM-CPT, United States District Court, Middle District of Florida (the "**U.S. Alliance Lawsuit**", at docket entry 26).

severity of USAG's [sponsored by the Bank] violations of law."[2] As noted in paragraph 16 above, it was the Bank's duty to conduct detailed customer due diligence before agreeing to provide cannabis related banking services to USAG.

25. The Bank estimated the cost of the lookback to exceed $1,000,000.[3]

26. The OCC's investigation ultimately determined that the Bank was engaged in "unsafe or unsound practice(s), including those relating to Bank Secrecy Act ("BSA") / Anti-Money Laundering ("AML") risk management and suspicious activity reporting, and violation(s) of law, rule, or regulation, including 12 C.F.R. § 21.11 (Suspicious Activity Reports) and 31 C.F.R. § 1010.610 (Due diligence programs for correspondent accounts for foreign financial institutions)."[4]

## BANK'S FAILURE TO HAVE QUALIFIED PERSONNEL

27. Despite the fact that it became apparent that the Bank did not have sufficiently trained officers, directors, senior managers or personnel to navigate the compliance regulations associated with providing cannabis related business, the Board of Bancshares and Bank did little or nothing to address the problems.

---

[2] *See* Complaint filed in the Sixth Circuit Court in and for Pasco County, Florida, removed to and pending in, the U.S. District Court for the Middle District of Florida, Tampa Division, as *NR Parentco, LLC, d/b/a Native Roots and RJJ Trinidad, LLC v. Payment Solutions, Int.'l, First National Bank of Pasco and U.S. Alliance Group, Inc.*, Case No. 8:25-cv-02085, DE1-1 ("**Native Roots Lawsuit**."), Ex. G, PageID 97.

[3] *Id.*

[4] *See* findings contained in the "Agreement by and Between First National Bank of Pasco, Dade City, Florida and the Office of the Comptroller of the Currency" dated September 11, 2025, a copy of which is attached hereto as **Exhibit B** (the "**OCC Agreement**") p. 1.

28.    The Board of Directors consists of 5 Octogenarians, a 77-year-old, and a 68-year-old, whose combined experience includes a personal injury lawyer, a trust and estates lawyer, a CPA, a "citrus grower," a retired office manager, dental assistant and registered nurse, someone in "insurance, real estate and agriculture," and the former Clerk of the Court for Pasco County. Not a single one of the directors identifies any prior banking experience.

29.    Moreover, notwithstanding the problems faced by the Bank, and the clear need for experienced senior management, the Director Defendants faced a revolving door for the Bank's President and CEO. According to Bancshares Annual Reports and articles published in the Tampa Bay Business Journal, since 2023, the President / CEO position has been held by Steve Hickman, James Esry, John Zazzera and now Paula S. O'Neil, the former Clerk of the Court of Pasco County.

30.    To be clear, the Director Defendants chose O'Neil as President and CEO to guide Bank through the OCC investigation, numerous lawsuits (discussed below), compliance with the OCC Operating Agreement, and compliance with complicated federal regulations governing cannabis related business. Notably, other than her board seat, O'Neil does not have any published banking experience.

## THE OCC OPERATING AGREEMENT

31.    As noted, the OCC investigation found unsafe and unsound banking practices related to the Bank's cannabis related business.

32.     Accordingly, on or about September 11, 2025, the Bank agreed to OCC enforcement action via the OCC Operating Agreement.

33.     The OCC Operating Agreement was announced and published by the OCC on October 16, 2025. This was the first time that Plaintiff became aware of the agreement, despite the fact that Plaintiff is a shareholder of Bancshares.

34.     The OCC Operating Agreement imposes substantial and onerous requirements upon the Bank. Plaintiff incorporates by reference the 31-page agreement, but notes the obligation to, at a minimum:

    a.  Within 60 days, appoint a Compliance Committee of at least three members, of which a majority shall be fully independent directors.  The Compliance Committee will submit to the board of directors on a quarterly basis its actions necessary to achieve compliance with the OCC Consent.

    b.  Within 90 days, adopt a written program to provide the overall direction, oversight, and corporate governance of the Bank, including, "**the retention of, at all times, a qualified CEO and senior management team, including President, CFO, and Chief Lending Officer,**" a "**management and Board succession plan designed to promote adequate staffing and continuity of capable management and oversight,**" and "**a process to periodically review the Bank's CEO and senior management to determine whether their knowledge and expertise are appropriate for the Bank's strategy, complexity, and risk profile.**" (Emphasis added).

    c.  Within 90 days, submit for review and approval a prior written determination a written Strategic Plan for the Bank, establishing objectives for the Bank's overall risk profile, earning performance, growth, balance sheet mix, off-balance sheet activities, liability structure, capital and liquidity adequacy, and product line development.

    d.  Submit the name, resume, required background reviews and such other information as may be requested for prior approval before the

appointment of any "senior executive officer" (as such term is defined in 12 C.F.R. §5.51(c)(4)), or the appointment of any person to the board of directors.

e.  Within 90 days, appoint and maintain a qualified Bank Secrecy Act ("BSA") officer vested with sufficient independence, authority, and resources to fulfill the duties and responsibilities of the position and ensure compliance with the requirements of the BSA and related regulations.

f.  Within 90 days, adopt a written program of policies and procedures to identify and control the risks associated with money laundering and terrorist financing and other illicit financial activity, and to achieve and maintain compliance with the BSA.

g.  Within 90 days, adopt a written customer due diligence program to ensure appropriate collection and analysis of customer information.

h.  Within 90 days, adopt a written suspicious activity monitoring and reporting program to ensure the timely and appropriate identification, review, and disposition of potentially suspicious or unusual activity, including the filing of suspicious activity reports.

i.  Within 90 days, adopt a written BSA/AML independent testing program to test the Bank's compliance with the BSA, relative to its risk profile, and the overall adequacy of the Bank's BSA/AML compliance program.

j.  Within 90 days, review and provide oversight of senior management's compensation and benefits, including a process for the Bank's Board of Director's review and decisioning for any senior management level employment contracts.

k.  Within 90 days, the Board shall adopt a "Board Oversight and Corporate Governance Program" that includes, at a minimum, "a comprehensive conflict of interest and insider lending policy applicable to the Bank's directors, principal shareholders, executive officers, affiliates, and employees ("Insiders") and related interests of such Insider." *See* OCC Operating Agreement, at Article III, ¶ 2(i).

35.     Reading the OCC Operating Agreement as a whole, the OCC Operating Agreement essentially calls for a complete overhaul of the Bank's Board of Directors and management. Thus, keeping the Director Defendants and management in their current position will not align with the spirit of the OCC Operating Agreement and can lead to further damages.

36.     The OCC Operating Agreement imposes upon the Director Defendants the obligation to ensure that the Bank has timely adopted and implemented all of the corrective actions required by the Agreement and shall verify that the Bank adheres to the corrective actions.

37.     It has been more than 30 days since the execution of the OCC Operating Agreement, and there have been no public announcements regarding the appointment of any qualified board members, senior managers, or other personnel to address the glaring deficiencies inherent in the Bank's operating procedures.[5]

38.     Representatives of DEF reached out to Bank to inquire about the retention of qualified personnel and compliance with the OCC Operating Agreement, but the Bank refused to provide information.

39.     In fact, a representative of the Bank advised DEF that it was the Board's intention to keep O'Neil as President and CEO, despite her clear lack of experience and qualifications to ensure compliance with the OCC Operating Agreement.

---

[5] Rather, the public announcements concerning the OCC Agreement and the Bank come in the form of articles detailing the "12 pages worth of AML issues identified at First National Bank of Pasco" and a note that there was no mention of any oversight or AML issues under the prior administration. *See* Sarah Beth Felix (Oct. 17, 2025). "INSIGHT: 12 pages worth of AML issues identified at First National Bank of Pasco" AML Intelligence. https://www.amlintelligence.com/2025/10/insight-key-problems-highlighted-by-occ-in-12-pages-of-aml-issues-at-first-national-bank-of-pasco/

83723344;3

40.     In an effort to assist the Bank and its Board of Directors to hire and retain qualified personnel that would satisfy the OCC, DEF submitted names and biographies for independent director and senior management candidates, including:

a. **Joel Dunn** - Mr. Dunn is President & CEO of PM Internal Audit Services LLC and has over 30 years of experience servicing both domestic and international financial institutions with their internal audit risk management needs. Mr. Dunn has extensive audit experience across various areas, including accounting, operations, lending, treasury, legal, human resources, compliance, and security, as well as BSA/AML, Office of Foreign Assets Control, Sarbanes-Oxley, and Federal Deposit Insurance Corporation Act compliance. Previously, Mr. Dunn was a Director at Acxell, formerly P&G Associates, and as an Audit Manager at RSM McGladrey. Before that, Mr. Dunn was an Assistant Vice President in the Internal Audit Department of Israel Discount Bank ("IDB"). In this role, he assisted in remediation efforts to comply with and the removal of two cease-and-desist orders involving IDB's BSA/AML Program.  Earlier in his career, Mr. Dunn served as a vice president in the internal audit department of Chinatrust Bank and as an assistant vice president in the internal audit departments at Citicorp, Emigrant Savings Bank, and Banco Popular. Mr. Dunn is a Certified Anti-Money Laundering Specialist and a Certified Internal Control Auditor. He is a graduate of Columbus University, a member of the Honorable Order of Kentucky Colonels, and Chairman of the Audit Committee for the New York Navy League.

b. **Steven Krueger** - Mr. Krueger is a Global Finance Technology Services Leader and a Principal in the Financial Services Business Consulting practice of Ernest & Young LLP, where he focuses on finance and risk management strategy, change management, and large-scale transformation programs, systems implementation and guidance, operating model design, strategic cost management, managed services, and data acquisition and management for clients globally. Previously, Mr. Krueger held senior risk, finance, technology, and operations roles at The Royal Bank of Scotland Group, Barclays Capital, and JPMorgan Chase & Co. Mr. Krueger began his career in the financial services industry practice group of Price Waterhouse LLP.  Mr. Krueger has a B.S. in International Economics from Sophia University in Japan.

c. **Nadeem V. Nasrallah** - Mr. Nasrallah served as a Special Agent of the Federal Bureau of Investigation from 2002 until 2024. As a Special Agent, Mr. Nasrallah was primarily engaged in terrorism and counterterrorism investigations. From 2017 to 2024, Mr. Nasrallah served as a Supervisory Special Agent and head of the FBI's Miami Joint Terrorism Task Force, where he oversaw investigations into terrorist financing involving foreign and domestic financial institutions, as well as counterterrorism investigations and operations. Mr. Nasrallah has a B.A. in Middle Eastern Culture and Languages from Wayne State University and a B.A. in Political Science and Middle East Politics from the American University of Beirut. Mr. Nasrallah has also obtained LDO (Licensed Dispensing Optician), ABOC (American Board of Opticianry Certification) and NCLEC (National Contact Lens Examiners Certification) from the Miami Dade College Medical Campus. In addition to English, Mr. Nasrallah is fluent in Arabic and French.

d. **Jorge Pedreira** - Mr. Pedreira is currently a shareholder and Senior Advisor to V2 Global, Inc., a risk mitigation firm, and a member of its Board of Advisors. Prior to his association with V2 Global, Mr. Pedreira was the Chief Operating Officer for Nomura's Investment Bank in the Americas, Special Counsel for Latin America at UBS Investment Bank, the Head of Investment Banking Legal at SG Cowen, and had practiced law with the firm of Willkie Farr & Gallagher in New York. Mr. Pedreira has led, managed, counseled, and supervised (i) investment banking operations, (ii) corporate transactions, including mergers and acquisitions and equity and debt financings, (iii) legal, compliance, and regulatory matters, (iv) human resources issues and compensation processes, (v) budgeting and forecasting, (vi) IT and related security, (vii) risk management, and (viii) internal audits and corporate investigations. Mr. Pedreira was also a Detective with the New York City Police Department, where he worked in numerous assignments at the Legal Bureau, Organized Crime Control Bureau, Narcotics Division, Public Morals Divisions, and the 75th Precinct. He received various recognition awards during his tenure at the NYPD. Mr. Pedreira is an attorney admitted to practice law in the United States Supreme Court, the State of New York, and in the State and Federal District Court of New Jersey. He holds a Juris Doctor from St. John's University School of Law, where he served as the Managing Editor of

both the Law Review and The Catholic Lawyer. Mr. Pedreira has had the following licenses from the Financial Industry Regulatory Association (FINRA): Series 24 (General Securities Principal), Series 79 (Investment Banking Representative), and Series 63 (Uniform Securities Agent State Law).

41.     The qualifications of the above individuals are self-evident, the appointment of which would enable the Bank to meaningfully address the current regulatory issues facing the Bank and the Director Defendants. Notwithstanding, upon information and belief, the Director Defendants have failed and refused to give serious consideration to the proposed individuals, instead seeking to protect their "turf" at the expense of shareholder values.

## **BREACH OF DUTY OF CARE**

42.     Under applicable Florida law, directors owe a fiduciary duty of care to act in good faith, and in a manner he or she reasonably believes to be in the best interests of the corporation.

43.     The duty of care requires directors to discharge their duties with the care that an ordinary and prudent person in a like position would reasonably believe appropriate under similar circumstances.

44.     The duty of care includes the obligation of oversight, and requires each director to become reasonably informed about issues facing the corporation before taking any action.

83723344;3

45.     The Director Defendants breached their fiduciary duty of care by acting willfully, recklessly, in a grossly negligent manner, and with a conscious disregard for the corporation's interest by failing to be reasonably informed before taking the following actions:

a. Choosing to provide cannabis related banking services without understanding the complex regulatory structure associated with such activity;

b. Actively soliciting cannabis related banking services, including touting Pasco Bank as the first federally regulated bank in the United States to provide loans to companies operating in the cannabis industry, when in fact, the Bank did not have sufficient personnel or protocols to comply with applicable banking laws, rules, regulations and guidance;

c. Continuing to provide cannabis related banking services even after it became apparent that the Bank did not have qualified directors, senior managers and compliance officers with the knowledge necessary to comply with applicable regulations and guidance imposed by federal regulators; and

d. Failing and refusing to add qualified directors, senior managers and compliance officers with the knowledge necessary to comply with applicable regulations and guidance imposed by federal regulators,

83723344;3

even after being investigated and examined by the OCC, resulting in federal regulator findings of unsafe and unsound banking practices, and the imposition of the OCC Operating Agreement.

## BREACH OF DUTY OF LOYALTY

46.    In addition to the duty of care, Florida law imposes fiduciary duties of loyalty upon directors of a Florida corporation.

47.    The duty of loyalty imposes a fiduciary obligation to the corporation and its shareholders to act in good faith, in the best interest of the corporation, and to place the interests of the corporation above their own self-interest.

48.    The Director Defendants breached their fiduciary duties of loyalty by acting in bad faith to the detriment of the corporation in order to protect and preserve their own positions on the Board of Bancshares and Bank, in order to maintain control and continue receiving the corresponding compensation and benefits associated therewith.

49.    DEF learned of the Bank's inability to comply with the federal banking laws, rules, regulations and guidance associated with cannabis related banking upon the filing of the US Alliance and Native Roots Lawsuits, and before the imposition of the OCC Operating Agreement.

50.    The principal of DEF, having extensive banking experience, reached out to the Board of Directors to offer advice and assistance, including recommending

potential directors, senior management, and personnel with extensive banking and compliance experience suited to addressing the inherent failures of the Bank's cannabis banking practices.

51.     The Board of Directors flat-out refused to engage or consider any candidates suggested by DEF, a substantial shareholder in Bancshares.

52.     Accordingly, DEF began the process of obtaining shareholder approval by written consent via a consent solicitation, a process expressly authorized by Florida law and consistent with Bancshares articles of incorporation, to remove one or more of the unqualified directors, and replace them with experienced candidates such as those list in paragraph 39 above; but, as discussed below, that effort was wrongfully thwarted by Bancshares.

53.     At the time, Bancshares Amended and Restated Bylaws expressly authorized any shareholder(s) with 10% or more of the corporation's stock to call a special meeting of the board directors, to remove directors by shareholder vote, and, consistent with Florida Statute 607.0704, authorized shareholder action by written consent in lieu of a meeting.

54.     Upon learning that DEF was considering arranging a shareholder vote by written consent, on August 21, 2025, the Board of Directors amended the bylaws in an obvious attempt to thwart a shareholder vote to replace the entrenched directors.

83723344;3

55.     First, the amendment added the following provision at Article II, § 14.

**Section 14 – NO ACTION WITHOUT A MEETING.** Any action which is required or permitted to be taken by the shareholders must be taken at a meeting called, convened, and conducted in accordance with these Bylaws.

56.     Clearly, this provision was designed to prevent the anticipated shareholder action by written consent, thereby limiting shareholder rights to remove directors, for the personnel benefit of the Director Defendants.

57.     Notably, the provision designed to protect the Board of Directors against shareholder action by written consent is unenforceable and illegal. Florida Statute 607.0704 expressly provides:

> **Unless otherwise provided in the articles of incorporation . . .** , action required or permitted by this chapter to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote if the action is taken by the holders of outstanding shares of each voting group entitled to vote thereon having not less than the minimum number of votes with respect to each voting group that would be necessary to authorize or take such action at a meeting at which all voting groups and shares entitled to vote thereon were present and voted. In order to be effective the action must be evidenced by one or more **written consents** describing the action taken, dated and signed by approving shareholders having the requisite number of votes of each voting group entitled to vote thereon, and delivered to the corporation by delivery to its principal office in this state, its principal place of business, the corporate secretary, or another officer or agent of the corporation having custody of the book in which proceedings of meetings of shareholders are recorded. (Emphasis added).

58.     Bancshares Articles of Incorporation do not exclude or limit the right of shareholders to act by written consent. Accordingly, the shareholders retain that

83723344;3

right by operation of law, and the Director Defendants efforts to thwart those rights in order to protect their own positions are illegal, unenforceable, and not in the best interests of the corporation.

59.    Not only did the Director Defendants ignore Florida law in attempting to strip shareholder rights to replace directors by written consents, they also created onerous roadblocks to thwart a shareholder from even raising the issue at a special meeting of shareholders.

60.    Whereas the then-existing bylaws permitted any shareholder(s) with 10% of the corporation stock to a call a meeting to consider replacing directors, the newly amended bylaws purported to increase the required percentage ownership to call a meeting to at least 51%, and further required such shareholders to deliver to the Chairman of the Board a "Shareholder Notice as described in Article II, Section 13."

61.    Article II, Section 13 created new, extremely onerous requirements to even a call a meeting. Specifically, the new provision provided:

**Section 13 – SHAREHOLDER NOTICES.** A Shareholder Notice must contain:

   A. The name and address of the shareholder providing the Shareholder Notice.

   B. The name and address of any other Company shareholder who is part of a "group[1]" with, a member of the "immediate family[2]" of, or who is or would be presumed[3] to be "acting in concert[4]" with, the shareholder providing the Shareholder Notice.

   C. The number of shares of Corporation common stock owned by each shareholder described in (A) or (B).

   D. The number of shares of Corporation common stock as to which each shareholder described in (A) or (B) has the power to vote or dispose of.

   E. A materially complete description of any arrangement or understanding between any shareholder described in (A) or (B) and any individual nominated for election as director in such Shareholder Notice, pursuant to which the nominated individual is proposed to be elected or to serve.

   F. With respect to any shareholder described in (A) or (B), and any individual named as a director nominee in the Shareholder Notice, a statement as to whether such individual has been, within the preceding five years, the subject of any action or event described in 17 CFR Section 230.506(d) and a materially complete description of such action or event.

   G. With respect to any shareholder described in (A) or (B), and any individual named as a director nominee in the Shareholder Notice, a statement as to whether such individual has been convicted[5] of a "covered offense[6]" and a materially complete description of the facts underlying such conviction.

   H. With respect to any individual named as a director nominee in the Shareholder Notice the information described in 17 CFR Section 240.14a-101, Item 7.

   I. A materially complete description of any substantial interest, direct or indirect, by security holdings or otherwise, of the shareholder providing the Shareholder Notice, and any shareholder described in (A) or (B), in any matter described in the Shareholder Notice, other than election as a director.

62.    These onerous requirements before a shareholder can even call a meeting are not in the best interest of the corporation and are again designed only to protect the position of the Director Defendants.

63.    Depriving the shareholders of the ability to vote on replacing entrenched directors with more qualified, experienced directors, particularly given the two lawsuits referenced above and the active OCC investigation and

83723344;3

examination, serves no valid business purpose, was and is intended only to protect the interests of the individual Director Defendants, to the detriment of the corporation and its shareholders.

## DAMAGES ASSOCIATED WITH THE DIRECTOR DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

64.    The corporation and its shareholders have suffered significant money damages as a result of the Director Defendants breaches of fiduciary duties.

65.    The Bank's own counsel estimated that it would cost in excess of one million dollars to comply the OCC's demand that the Bank conduct a "lookback" on USAG, the Bank's chosen partner in processing cannabis related payments.

66.    The costs to defend, settle and/or try the USAG Lawsuit and the Native Roots Lawsuit will likely cost hundreds of thousands, if not millions of dollars.

67.    The cost to comply with OCC Operating Agreement will likely cost hundreds of thousands of dollars, if not more.

68.    Moreover, the value of the Bank and corresponding shareholder value has significantly diminished due the OCC finding that Bank engaged in unsafe and unsound banking requirements, and the imposition of onerous reporting requirements with which the bank is now saddled.

## DERIVATIVE ALLEGATIONS

69.     This action is brought pursuant to Federal Rule of Civil Procedure 23.1 and Florida Statute 607.0741 *et. seq.* for the benefit of DEF and the other shareholders of Bancshares.

70.     DEF acquired its shares in Bancshares, and therefore indirectly in Bank, in December 2024, and has continuously held shares through the present day. Currently, DEF owns 108,900 shares of common stock, which is less than 10%.

71.     DEF will fairly and adequately represent the interests of similarly situated shareholders.

72.     This action is not a collusive one to confer jurisdiction upon this court.

73.     Formal demand to bring this action has not been made upon the corporation. Such demand is not required pursuant to Florida Statute 607.0742 because: (i) the demand would be futile given that each and every current member of the board of directors of Bancshares and Bank are named as defendants herein; and (ii) Bancshares and Bank will suffer material and irreparable injury if Plaintiff is forced to comply with the 90 day waiting period generally imposed by the statute because, as discussed above, Bank is subject to strict deadlines contained in the OCC Operating Agreement dated September 11, 2025, with significant compliance deadlines as soon as November 10, 2025 (60 days from the agreement) and

December 10, 2025 (90), and upon information and belief, will not meet those deadlines.

74.     DEF representatives, through its principal and counsel, have requested information concerning the Bank's efforts to hire senior management and board members with knowledge and experience to comply with the strict requirements imposed by the OCC Operating Agreement and federal guidelines related for cannabis related banking, but have been ignored and stonewalled at every junction.

75.     Bancshares and Bank are nominal defendants, as opposed to nominal plaintiffs, because the management and board of each nominal defendant are antagonistic to DEF and its efforts to ensure the retention of directors and senior management with the experience necessary to comply with the OCC Operating Agreement. *See Liddy v. Urbanek* 707 F.2d 1222 (11th Cir. 1983); *Whitten v. Clarke*, 41 F.4th 1340 (11th Cir. 2022).

76.     All conditions precedent to the institution of this action have occurred, been performed or excused.

## COUNT I
## BREACH OF FIDUCIARY DUTY

77.     Plaintiff incorporates and realleges the allegations contained in paragraphs 1 – 76 as if fully set forth herein.

78.     Each Director Defendant owes fiduciary duties of care, loyalty and good faith to Bancshares and Bank to act in the best interest of the corporations and their shareholders.

79.     Each Director Defendant breached those duties by performing the actions detailed in paragraphs 45 and 48-63 above.

80.     The actions of each Director Defendant were willful, grossly negligent, placed their own personal interests above those of the corporations and their shareholders and represent a conscious disregard for the rights of the corporations they represent and the shareholders thereof.

81.     Plaintiff and each similarly situated shareholder and the corporations suffered monetary damages in excess of the jurisdictional minimum of this Court as a direct and proximate result of the breaches of fiduciary duties detailed herein.

## COUNT II
## DECLARATORY JUDGMENT

82.     Plaintiff incorporates and realleges the allegations contained in paragraphs 1 – 76 as if fully set forth herein.

83.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

84.     Prior to August 21, 2025, Florida Bancshares was governed by the Amended and Restated Bylaws of Florida Bancshares, Inc., ("Amended Bylaws"), a copy of which is attached hereto as Exhibit C.

83723344;3

85.     Article II, Section 13 of the Amended Bylaws provides:

> **Section 13 – ACTION WITHOUT A MEETING.** Any action which is required or permitted to be taken by the shareholders may be taken without a meeting if consent in writing, setting forth the action to be taken, and signed by such shareholders pursuant to Section 607.0704, *Florida Statutes*. Any such written consent shall be filed in the minutes of the proceedings of the shareholders of the Corporation.

86.     On August 21, 2025, the Director Defendants adopted the Second Amended and Restated Bylaws of Florida Bancshares, Inc. (the "Second Amended Bylaws"), a copy of which is attached hereto as Exhibit D.

87.     In the Second Amended Bylaws, the Director Defendants removed the right of shareholders to vote by written consent.

88.     Specifically, the Second Amended Bylaws add Section 14, which provides:

> **Section 14 – NO ACTION WITHOUT A MEETING.** Any action which is required or permitted to be taken by the shareholders must be taken at a meeting called, convened, and conducted in accordance with these Bylaws.

89.     At the time the Director Defendants adopted the Second Amended Bylaws, Plaintiff was preparing a consent solicitation in order to obtain the written consent of Bancshare's shareholders to remove replace some of the existing directors and senior management with more qualified directors and senior management capable of addressing the complicated issues facing the bank caused the decision to provide cannabis related banking business.

83723344;3

90. The Second Amended Bylaws purport to prevent a shareholder from voting via written consent.

91. It is Plaintiff's position that Section 14 in the Second Amended Bylaws is unenforceable and should be declared null and void.

92. As detailed in paragraph 57 above, Florida law grants shareholders the right to vote by written consent unless that power is eliminated by the **articles of incorporation.** That is for good reason, as only shareholders can adopt or amend the articles of incorporation.

93. But the Director Defendants purport to eliminate the shareholder's right to vote by written consent by amending bylaws. That is contrary to Florida law.

94. There is an actual and present controversy.

95. Plaintiff has spent considerable time and resources on counsel who investigated the process and prepared draft solicitations, obtained shareholder lists, and obtained estimates from third parties to process the solicitation and tabulation.

96. Defendant has thwarted that process by amending the bylaws to prohibit shareholder vote by written consent.

97. There is an immediate need for a declaration of the parties' rights.

98. As detailed throughout this Complaint, the bank is subject to the OCC Operating Agreement that contains extensive and complex compliance requirement.

99.    Immediate deadlines are looming, and the current board of directors and senior management are not sufficiently qualified to meet the requirements imposed by the OCC.

100.    Plaintiff requests that the Court exercise its discretion to take jurisdiction over this controversy and declare that (i) Article II, Section 14 of the Second Amended Bylaws is unenforceable, null and void; (ii) notwithstanding the provision of Article II, Section 14 of the Second Amended Bylaws, directors can be removed by shareholder vote via written consent.

## COUNT III
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

101.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 – 76 as if fully set forth herein.

102.    Based upon the facts alleged herein, Plaintiff has established a likelihood of success on the merits of the claims asserted herein, including breaches of fiduciary duties outlined in paragraphs 42-63.

103.    As a direct and proximate result of Director Defendants' conduct, Plaintiff and the bank have suffered and will continue to suffer irreparable harm.

104.    Both the balance of equities and public interest weigh in favor of granting both preliminary and permanent injunctive relief to enjoin Director Defendants' conduct from causing further harm to Plaintiff and the Bank.

105.    Plaintiff and the Bank have no adequate remedy at law.

106.   Plaintiff requests that the Court: (1) preliminarily and permanently enjoin Defendants from violating the OCC Regulations and compel compliance with all regulations governing the Bank, including but not limited to the OCC Regulations; (2)  compel the Defendants to replace the CEO/President and replace the current Director Defendants with qualified directors; and (3) compel Defendants to add qualified directors to the Board to ensure compliance with all regulatory requirements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court enter an order and judgment against the Defendants as follows:

i.      Awarding Plaintiff preliminary and permanent injunctive relief enjoining Defendants from violating the OCC Regulations, compelling compliance with all regulations governing the Bank, including but not limited to the OCC Regulations, and compelling compliance with the OCC Operating Agreement;

ii.     Issuing an order compelling Defendants to replace the CEO/President and replace the current Directors with qualified directors and further compelling Defendants to add qualified directors to the Board to ensure compliance with all regulatory requirements;

iii.    Issuing an order and judgment granting declaratory and injunctive relief;

83723344;3

iv.     awarding damages to Plaintiff;

v.     Issuing an order declaring that (i) Article II, Section 14 of the Second Amended Bylaws is unenforceable, null and void; and (ii) notwithstanding the provision of Article II, Section 14 of the Second Amended Bylaws, directors can be removed by shareholder vote via written consent; and

vi.     Awarding Plaintiff such further relief the Court deems just and proper.

*/s/ John L. Dicks II*
John Dicks, Esq.
Florida Bar No. 89012
Primary email: john.dicks@akerman.com
Secondary email:
judy.mcarthur@akerman.com
**AKERMAN LLP**
401 E. Jackson  Street, Suite 1700
Tampa, Florida  33602
Telephone:  (813) 223-7333
Facsimile:  (813) 223-2837

Andrew P. Gold, Esq.
Florida Bar No. 612367
Primary email: andrew.gold@akerman.com
Secondary email: jill.parnes@akerman.com
**AKERMAN LLP**
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, Florida 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

*Counsel for Plaintiff*

83723344;3

Fort Lauderdale, Florida 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

By: _____
Andrew P. Gold, Esq.
Florida Bar No. 612367
Primary email: andrew.gold@akerman.com
Secondary email: jill.parnes@akerman.com
John Dicks, Esq.
Florida Bar No. 89012
Primary email: john.dicks@akerman.com
Secondary                                              email:
judy.mcarthur@akerman.com

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:        October 27, 2025

_____
Daniel Fulgham

83723344;1