UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEF TRADING, LLC,

      Case No. 8:25-cv-02996-SDM-CPT

     Plaintiff,

v.

FLORIDA BANCSHARES, INC. and
FIRST NATIONAL BANK OF PASCO
as nominal defendants and ANDER PLATT
GIBBS, JOHN HENSON, PAUL MIDILI,
ERNEST PEEPLES, MARLENE MANN,
STEVEN CARLE, AND PAULA S. O'NEIL,

     Defendants.
_____/

**PLAINTIFF'S VERIFIED TIME-SENSITIVE
MOTION FOR PRELIMINARY INJUNCTION
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

83787191;6

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...........................................................................1

II. REQUESTED RELIEF ....................................................................................3

III. SUMMARY OF FACTS SUPPORTING INJUNCTIVE RELIEF ...................4

    A. The Director Defendants..........................................................................4

    B. Cannabis-Related Banking.......................................................................5

    C. The Bank's Cannabis-Related Business.....................................................6

    D. The OCC Investigation............................................................................6

    E. The Bank's Failure to Have Qualified Directors..........................................7

    F. The OCC Operating Agreement ...............................................................8

    G. DEF's Proposal to Appoint Qualified Board Members is Ignored................10

    H. Director Defendants Seek Only to Protect Their Own Positions ...................11

    I. Derivative Action ..................................................................................15

IV. MEMORANDUM OF LAW ..........................................................................15

    A. DEF Has a Substantial Likelihood of Success on the Merits........................16

    B. The Bank And Shareholders will Suffer Irreparable Harm Absent an
       Injunction............................................................................................21

    C. The Balance of the Harms Weighs in Favor of Granting Injunctive
       Relief..................................................................................................22

    D. Public Interest Supports an Injunction .....................................................23

    E. Only A Nominal Bond Should be Required ...............................................23

V. CONCLUSION.............................................................................................24

83787191;6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*777 Partners LLC v. Pagnanelli*,
  2023 WL 11965485 (S.D. Fla. July 17, 2023) ....................................................18

*Bancor Group Inc. v. Rodriguez*,
  Case # 22-20201, 2023 WL 4972881 (S.D. Fla. July 5, 2023) (report and
  recommendation, adopted on all relevant points at 2023 WL 6441904) ....... 20, 21

*Disorbo v. American Van Lines, Inc.*
  354 So.3d 530 (Fla. 4th DCA 2023) ...................................................................20

*Haitian Refugee Center, Inc. v. Nelson*,
  872 F.2d 1555 (11th Cir. 1989)..........................................................................16

*In re Aqua Clear Technologies, Inc.*,
  361 B.R. 567 (Bankr. S.D. Fla. 2007) .................................................................16

*In re Walt Disney Co. Derivative Litigation*,
  907 A.2d 693 (Del. Ch. 2005) ..................................................................... 17, 18

*JPMorgan Chase Bank, N.A. v. Ben-Ezra & Katz, P.A.*,
  2011 WL 1458066 (S.D. Fla. 2011).....................................................................16

*Liddy v. Urbanek*
  707 F.2d 1222 (11th Cir. 1983)...........................................................................15

*Taubenfeld v. Lasko*,
  324 So.3d 529 (Fla. 4th DCA 2021) .........................................................16, 17, 18

*Whitten v. Clarke*,
  41 F.4th 1340 (11th Cir. 2022) ...........................................................................15

**Statutes**

12 U.S.C. § 1813(q) .................................................................................................4

Bank Secrecy Act................................................................................. 1, 2, 7, 9

Bank Secrecy Act, 31 U.S.C. § 5311, *et. seq.*............................................................5

Controlled Substances Act, 18 U.S.C. § 801 *et. seq.* .................................................5

83787191;6

Fla. Stat. 607.0830 (1)........................................................................................16

Fla. Stat. 607.0830 (2)........................................................................................17

Fla. Stat. § 607.0831 ..........................................................................................20

Florida Statute 607.0704.....................................................................................12

Florida Statute 607.0741 *et. seq.*.......................................................................15

Florida Statute 607.0742.....................................................................................15

**Rules**

Federal Rule of Civil Procedure 23.1...................................................................15

Local Rule 3.01(f).............................................................................................1, 3

Rule 65, Fed. R. Civ. P. ........................................................................................1

**Other Authorities**

12 C.F.R. § 5.51(c)(4) ..........................................................................................9

12 C.F.R. § 21.11.............................................................................................1, 7

31 C.F.R. § 1010.610 ......................................................................................2, 7

83787191;6

Pursuant to Rule 65, Fed. R. Civ. P., and Local Rule 3.01(f), Plaintiff DEF Trading, LLC ("**DEF**" or "**Plaintiff**"), requests the Court enter a preliminary injunction on an expedited basis against Defendants Ander Platt Gibbs ("**Gibbs**"), John Henson ("**Henson**"), Paul Midili ("**Midili**"), Ernest Peeples ("**Peeples**"), Marlene Mann ("**Mann**"), Steven Carle ("**Carle**"), and Paula S. O'Neil ("**O'Neil**"; collectively with  Gibbs, Henson, Midili, Peeples, Mann, and Carle, the "**Director Defendants**"), and nominal Defendants Bancshares, Inc. ("**Bancshares**") and First National Bank of Pasco ("**Bank**" and collectively with Bancshares, the ("**Bank Defendants**").

## I. PRELIMINARY STATEMENT

This motion is supported by the Verified Complaint (ECF 1). Plaintiff is the single largest shareholder of Bancshares, which owns 100% of Bank. Bank, through the Director Defendants, made a strategic decision to enter the cannabis-related banking business. The problem, however, is that cannabis-related banking is complex and heavily regulated and none of the Director Defendants had the requisite knowledge or experience to navigate those regulations, placing the Bank at substantial risk.

Predictably, the U.S. Treasury, Office of the Comptroller of Currency ("**OCC**"), initiated an investigation finding, *inter alia,* that Bank engaged in "unsafe or unsound practice(s), including those relating to Bank Secrecy Act ("BSA") / Anti-Money Laundering ("AML") risk management and suspicious activity reporting, and violation(s) of law, rule, or regulation, including 12 C.F.R. § 21.11 (Suspicious Activity

83787191;6

Reports) and 31 C.F.R. § 1010.610 (Due diligence programs for correspondent accounts for foreign financial institutions)."[1] This led to execution of a consent agreement between Bank and the OCC dated September 11, 2025, a copy of which is attached hereto as **Exhibit A** (the "**OCC Operating Agreement**").

Essentially, the OCC Operating Agreement directed that Bank bring in independent senior management and directors with relevant experience to develop and implement procedures to ensure compliance with federal regulations including BSA, AML, and Suspicious Activity Report ("**SAR**") requirements. The OCC Operating Agreement imposed strict 60 and 90 day deadlines for compliance. Those dates have now come and gone, and, upon information and belief, Bank has failed to meet most, if not all, of the imposed requirements.[2]

In fact, rather than comply with the OCC requirements, the Director Defendants are acting to protect their own lucrative positions with the Bank, even going so far as to unlawfully amend the Banking Defendants' bylaws to prevent shareholders from acting by written consent or by special meeting to remove or replace the Director Defendants. Further, upon information and belief, the Directors have

---

[1] *See* findings contained in the "Agreement by and Between First National Bank of Pasco, Dade City, Florida and the Office of the Comptroller of the Currency" dated September 11, 2025, a copy of which is attached hereto as **Exhibit A,** p. 1.

[2] Despite the fact that Plaintiff is Bank's single largest shareholder, Bank has refused to provide any information regarding efforts to comply with the OCC Operating Agreement to Plaintiff or its counsel. Accordingly, the allegations of non-compliance are based upon information and belief, including the fact that are no published reports of any changes or additions to Bank's senior management or directors. This will be the subject of requested expedited discovery.

2

83787191;6

hired a broker in an effort to sell the assets of the bank. A sale under the pending circumstances would be a "fire sale" and Plaintiff, as the single largest stockholder, would suffer significant harm.

## II. <u>REQUESTED RELIEF</u>

By this motion, Plaintiff seeks an order (i) requiring Defendants to forthwith comply with the provisions of the OCC Operating Agreement relating to the retention of qualified management and directors, (ii) prohibiting Defendants from enforcing the unlawful amendment to bylaws impeding the shareholders from removing and replacing the recalcitrant Director Defendants via written consent, (iii) declaring Article II, Sections 13 and 14 of the Second Amended and Restated Bylaws of Banchares to be unenforceable, (iv) prohibiting the current Director Defendants from selling the assets of the Bank absent shareholder or Court approval; and (v) prohibiting the Director Defendants from taking any out of the ordinary course actions that would materially affect shareholder value until the Bank is in full compliance with the OCC Operating Agreement.

This motion seeks expedited relief pursuant to Local Rule 3.01(f) at the Court's earliest convenience because critical deadlines in the OCC Operating Agreement have, upon information and belief, past without compliance, threatening the stability and value of the Bank, and causing actual and threatened harm to the shareholders of the Banking Defendants. Given the significant existing and threatened irreparable harm, Plaintiff requests the Court provide relief on or before January 30, 2026.

83787191;6

## III. SUMMARY OF FACTS SUPPORTING INJUNCTIVE RELIEF

Nominal Defendant First National Bank of Pasco is a national banking association within the meaning of 12 U.S.C. § 1813(q) with its principal place of business in Pasco County. Bancshares is the ultimate beneficial owner of 100% of the stock in the Bank.

Bancshares board of directors (the "**Board**") is comprised of Gibbs, Henson, Midili, Peeples, Mann, Carle and O'Neil. The Director Defendants also comprise the board of directors for the Bank.[3]

**A. The Director Defendants.** O'Neil is the current President and Chief Executive Officer of the Bank. According to Bancshares April 4, 2025 Annual Meeting of Shareholders Proxy Statement (the "**Proxy Statement**"), Gibbs is an 85 years old retired personal injury and wrongful death attorney, and is eligible for reelection in 2026; O'Neil is the retired Pasco County Clerk of Court, is 68 years old and is serving a 3-year term; Henson is a CPA, 77 years old, and was elected to a 3-year term in 2025; Midili is in "insurance, real estate, agriculture," is 88 years old and is eligible for reelection in 2027; Peeples is a Citrus Grower, is 87 years old and is eligible for reelection in 2027; Mann is a retired office manager, dental assistant and registered nurse, is 81 years old, and is serving a 3-year term; and Carle is an attorney that concentrates on wills, trusts and estates, is 80 years old, and is eligible for reelection in

---

[3] Each of the Director Defendants signed the OCC Operating Agreement as a director of the Bank.

83787191;6

2026. Notably, none of the Director Defendants have any published experience in banking, let alone in the complex world of cannabis-related banking.

**B. Cannabis-Related Banking.** Marijuana is classified as a Schedule 1 drug under the federal Controlled Substances Act, 18 U.S.C. § 801 *et. seq.* Accordingly, and despite some state laws to the contrary, it is illegal to possess, use, buy, sell or cultivate marijuana. Pursuant to the Bank Secrecy Act, 31 U.S.C. § 5311, *et. seq.* ("**BSA**"), implemented in part to combat money laundering, banks are obligated to file an SAR when, a "Marijuana Limited SAR Filing," a "Marijuana Priority SAR Filing," and a "Marijuana Termination SAR Filing." Additionally, *before* providing such services, the bank should conduct customer due diligence, including:

a. verifying with the appropriate state authorities whether the business is duly licensed and registered;

b. reviewing the license application (and related documentation) submitted by the business for obtaining a state license to operate its marijuana-related business;

c. requesting from state licensing and enforcement authorities available information about the business and related parties;

d. developing an understanding of the normal and expected activity for the business, including the types of products to be sold and the type of customers to be served (e.g., medical versus recreational customers);

e. ongoing monitoring of publicly available sources for adverse information about the business and related parties;

f. ongoing monitoring for suspicious activity, including for any of the red flags described in this guidance; and

g. refreshing information obtained as part of customer due diligence on a periodic basis and commensurate with the risk.

5

83787191;6

**C. The Bank's Cannabis-Related Business.** In or about 2022, the Bank, through its Board, decided to solicit cannabis-related banking business. Specifically, the Bank offered ACH payment processing services to merchants and third-party processors in cannabis-related businesses. As detailed in a sworn Verified Complaint in the U.S. Alliance Lawsuit, the Bank, through its Director Defendants, misrepresented their cannabis banking experience and "held themselves out . . . as experienced in the cannabis electronic payments industry and touted Pasco Bank as the first federally regulated bank in the United States to provide loans to companies operating in the cannabis industry," "represented that they could adequately onboard, process, and settle ACH transactions" for cannabis-related merchants and third party processors.[4] The Bank signed a series of processing agreements with U.S. Alliance Group, Inc. and its affiliate, Payment Solutions International, LLC, by which the Bank agreed to process cannabis-related transactions. However, it quickly became apparent that the Bank lacked officers, directors, personnel, or protocols with sufficient relevant knowledge and experience to ensure compliance with the complicated regulations to provide cannabis-related banking business.

**D. The OCC Investigation.** In or around 2024 and 2025, the OCC began an investigation into the Bank's cannabis-related business. As part of the OCC's investigation, the "Bank's primary regulator demanded that the Bank obtain a third-

---

[4] Verified First Amended Complaint for Damages, Declaratory Relief, and Injunctive Relief in the matter *U.S. Alliance Group, Inc. et. al. v. First National Bank of Pasco, et. al.,* Case No. 8:25-01458-SDM-CPT, United States District Court, Middle District of Florida (the "**U.S. Alliance Lawsuit**", at docket entry 26).

83787191;6

party lookback to determine the scope and severity of USAG's [sponsored by the Bank] violations of law."[5] As noted *supra*, the Bank had an affirmative duty to conduct detailed customer due diligence before agreeing to provide cannabis-related banking services to USAG. The Bank estimated the cost of the lookback to exceed $1,000,000.[6]

As noted, the OCC determined that the Bank was engaged in "unsafe or unsound practice(s), including those relating to Bank Secrecy Act ("BSA") / Anti-Money Laundering ("AML") risk management and suspicious activity reporting, and violation(s) of law, rule, or regulation, including 12 C.F.R. § 21.11 (Suspicious Activity Reports) and 31 C.F.R. § 1010.610 (Due diligence programs for correspondent accounts for foreign financial institutions)."[7]

**E. The Bank's Failure to Have Qualified Directors.** The Bank found itself subject to an OCC investigation because it did not have sufficiently trained officers, directors, senior managers, or personnel to navigate the compliance regulations associated with providing cannabis-related business. Yet, even after the OCC investigation commenced, the Director Defendants did little or nothing to address the problems plaguing the Bank.

---

[5] *See* Complaint filed in the Sixth Circuit Court in and for Pasco County, Florida, removed to and pending in, the U.S. District Court for the Middle District of Florida, Tampa Division, as *NR Parentco, LLC, d/b/a Native Roots and RJJ Trinidad, LLC v. Payment Solutions, Int.'l, First National Bank of Pasco and U.S. Alliance Group, Inc.*, Case No. 8:25-cv-02085, DE1-1 ("**Native Roots Lawsuit**."), Ex. G, PageID 97.

[6] *Id.*

[7] *Supra,* note 2.

7

83787191;6

To be clear, not a single Director Defendant identifies any prior banking experience, much less any cannabis-related experience. Notwithstanding the glaring need for experienced senior management, the Director Defendants faced a revolving door for the Bank's President and CEO. According to Bancshares Annual Reports and articles published in the Tampa Bay Business Journal, since 2023, the President / CEO position has been held by three separate individuals *before* Paula S. O'Neil, the former Clerk of the Court of Pasco County, assumed the position. Critically, other than her board seat, O'Neil, the CEO chosen by the Director Defendants to lead the Bank through this crisis, does not have any published banking experience.

**F. The OCC Operating Agreement.** The OCC investigation found unsafe and unsound banking practices related to the Bank's cannabis-related business. On September 11, 2025, the Bank agreed to OCC enforcement action via the OCC Operating Agreement. The OCC Operating Agreement, while dated September 11, 2025, was announced and published by the OCC on October 16, 2025. That is the first time that Plaintiff became aware of the agreement, despite the fact that Plaintiff is the single largest shareholder of Bancshares.

The OCC Operating Agreement imposes substantial and onerous requirements upon the Bank. Plaintiff incorporates by reference the 31-page agreement, but notes the obligation to, at a minimum:

 a. Within 60 days, appoint a Compliance Committee of at least three members, of which a majority shall be fully independent directors. The Compliance Committee will submit to the board of directors on a quarterly basis its actions necessary to achieve compliance with the OCC Consent.

83787191;6

b.  Within 90 days, adopt a written program to provide the overall direction, oversight, and corporate governance of the Bank, including, "**the retention of, at all times, a qualified CEO and senior management team, including President, CFO, and Chief Lending Officer," a "management and Board succession plan designed to promote adequate staffing and continuity of capable management and oversight," and "a process to periodically evaluate the Bank's CEO and senior management to determine whether their knowledge and expertise are appropriate for the Bank's strategy, complexity, and risk profile."** (Emphasis added).

c.  Within 90 days, submit for review and approval, a written Strategic Plan for the Bank, establishing objectives for the Bank's overall risk profile, earning performance, growth, balance sheet mix, off-balance sheet activities, liability structure, capital and liquidity adequacy, and product line development.

d.  Submit the name, resume, required background reviews and such other information as may be requested for prior approval before the appointment of any "senior executive officer" (as such term is defined in 12 C.F.R. §5.51(c)(4)), or the appointment of any person to the board of directors.

e.  Within 90 days, appoint and maintain a qualified Bank Secrecy Act officer vested with sufficient independence, authority, and resources to fulfill the duties and responsibilities of the position and ensure compliance with the requirements of the BSA and related regulations.

f.  Within 90 days, adopt a written program of policies and procedures to identify and control the risks associated with money laundering and terrorist financing and other illicit financial activity, and to achieve and maintain compliance with the BSA.

g.  Within 90 days, adopt a written customer due diligence program to ensure appropriate collection and analysis of customer information.

h.  Within 90 days, adopt a written suspicious activity monitoring and reporting program to ensure the timely and appropriate identification, review, and disposition of potentially suspicious or unusual activity, including the filing of suspicious activity reports.

i.  Within 90 days, adopt a written BSA/AML independent testing program to test the Bank's compliance with the BSA, relative to its risk profile, and the overall adequacy of the Bank's BSA/AML compliance program.

83787191;6

j.  Within 90 days, review and provide oversight of senior management's compensation and benefits, including a process for the Bank's Board of Director's review and decisioning for any senior management level employment contracts.

k.  Within 90 days, the Board shall adopt a "Board Oversight and Corporate Governance Program" that includes, at a minimum, "a comprehensive conflict of interest and insider lending policy applicable to the Bank's directors, principal shareholders, executive officers, affiliates, and employees ("Insiders") and related interests of such Insider." *See* OCC Operating Agreement, at Article III, ¶ 2(i).

When considering the OCC Operating Agreement as a whole, the OCC Operating Agreement effectively calls for a complete overhaul of the Bank's Board of Directors and management. Thus, keeping the Director Defendants and management in their current position does not align with the spirit of the OCC Operating Agreement and can lead to further suspensions, fines, penalties, a material loss in shareholder value, and ultimately, the forced sale of the Bank.

Further, the OCC Operating Agreement imposes the obligation to ensure that the Bank has timely adopted and implemented all of the corrective actions required by the agreement and shall verify that the Bank adheres to the corrective actions. The 60 and 90 day deadlines expired on November 10, 2025, and December 10, 2025, respectively, and there have been **no** public announcements regarding the appointment of any qualified board members, senior managers, or other personnel to address the glaring deficiencies inherent in the Bank's operating procedures. Further, the Defendants have failed to provide any information to DEF, its largest shareholder, regarding efforts to comply with the Operating Agreement.

**G. DEF's Proposal to Appoint Qualified Board Members is Ignored.** In response to the OCC Operating Agreement requirements, DEF reached out to the

10

83787191;6

Bank to inquire about the retention of qualified personnel and compliance with the OCC Operating Agreement, but the Bank refused to provide information. Rather, the Bank advised DEF that it was the Board's intention to keep O'Neil as President and CEO, despite her obvious lack of experience and qualifications to ensure compliance with the OCC Operating Agreement. In an effort to assist the Bank and its Board to navigate through the requirements imposed by the OCC Operating Agreement and to hire and retain qualified personnel that would satisfy the OCC, DEF submitted names and biographies for independent director and senior management candidates. DEF submitted four names of qualified individuals (Joel Dunn, Steven Krueger, Nadeem Nasrallah and Jorge Pedreira), all of which have vast banking, finance, regulatory and risk management experience.

Notwithstanding the need for qualified directors, the Director Defendants refused to give thoughtful consideration to the proposed individuals. Rather, the Director Defendants are steadfast in remaining in their current positions at the expense of the Bank and shareholder values.

**H. Director Defendants Seek Only to Protect Their Own Positions.**

Rather than comply with the OCC mandate to bring in qualified personnel, the Director Defendants have only acted to protect their own positions. The Director Defendants have ignored efforts by shareholders to provide qualified candidates for senior management and director positions, despite the clear need for both. Even worse, during the OCC investigation and days before formally signing the OCC Operating Agreement, the Director Defendants purported to amend Bancshares bylaws to

11

83787191;6

impede shareholders from exercising their statutory rights to remove and replace directors.

Frustrated with the Director Defendant's refusal to consider experienced personnel to guide the Bank through the OCC investigation and compliance issues, DEF began the process of obtaining shareholder approval to replace certain directors by written consent via a consent solicitation, a process expressly authorized by Florida law, Bancshares articles of incorporation,[8] and Bancshares then existing bylaws.[9] In response, on August 21, 2025, during the OCC investigation and just days before executing the OCC Operating Agreement, the Director Defendants wrongfully thwarted DEF's attempt by purporting to amend Bancshares bylaws. Specifically, the amendment added the following provision at Article II, §14, prohibiting shareholder action by written consent.[10]

> **Section 14 – NO ACTION WITHOUT A MEETING.** Any action which is required or permitted to be taken by the shareholders must be taken at a meeting called, convened, and conducted in accordance with these Bylaws.

To be clear, the purported amendment by the Board is unenforceable and unlawful. Florida Statute 607.0704 expressly provides:

> Unless otherwise provided **in the articles of incorporation . . .** , **action required or permitted by this chapter to be taken** at an annual or special meeting of shareholders **may be taken without a meeting, without prior**

---

[8] See Restated Articles of Incorporation of Florida Bancshares, Inc. dated March 26, 2012 (the "**Articles of Incorporation)** attached hereto as **Exhibit B** at Art IV, §§ A.2., B.3.2, C.3.2.

[9] See, the Amended and Restated Bylaws of Florida Bancshares, Inc. dated March 21, 2024 (the "**Existing Bylaws**") attached as **Exhibit C** at Section 13.

[10] The Second Amended and Restated Bylaws of Florida Bancshares, Inc. dated August 21, 2025 (the "**Amended Bylaws**") are attached as **Exhibit D.**

83787191;6

**notice, and without a vote** if the action is taken by the holders of outstanding shares of each voting group entitled to vote thereon having not less than the minimum number of votes with respect to each voting group that would be necessary to authorize or take such action at a meeting at which all voting groups and shares entitled to vote thereon were present and voted. **In order to be effective the action must be evidenced by one or more written consents** describing the action taken, dated and signed by approving shareholders having the requisite number of votes of each voting group entitled to vote thereon, and delivered to the corporation by delivery to its principal office in this state, its principal place of business, the corporate secretary, or another officer or agent of the corporation having custody of the book in which proceedings of meetings of shareholders are recorded. (Emphasis added).

Bancshares *Articles of Incorporation* expressly authorize shareholder action by written consent, specifically including the removal of directors with or without cause. *See,* note 8. The Director Defendants cannot limit the shareholders' ability to remove directors via a written consent by amending *bylaws.* Only an amendment to the *articles of incorporation* could affect such a change. That is for good reason. Only shareholders can amend the articles of incorporation. Thus, only shareholders can vote to limit their own rights to remove directors. Directors cannot act to protect themselves against removal by amending *bylaws.*

To make matters worse, the Director Defendants attempted to impede shareholders' ability to remove directors *even at* a special meeting of shareholders called for that purpose. The Existing Bylaws permitted "shareholders holding at least 10% of the outstanding shares of the Corporation" to call a special meeting of shareholders. Art. II, § 2. Notice for such meeting could be mailed or e-mailed to shareholders and simply needed to state the place, day, hour and "purpose or purposes for which the meeting is called." Art. II, § 4.

13

83787191;6

The August 21, 2025, Amended Bylaws not only eliminated shareholder action by written consent, but changed the minimum percentage required for shareholders to call a Special Meeting from 10% to 51%.  The Amended Bylaws also created a new Section 13 entitled Shareholder Notices imposing extremely onerous requirements for a shareholder to call a meeting. Section 13 reads in its entirety:

**Section 13 – SHAREHOLDER NOTICES.** A Shareholder Notice must contain:

A. The name and address of the shareholder providing the Shareholder Notice.

B. The name and address of any other Company shareholder who is part of a "group[1]" with, a member of the "immediate family[2]" of, or who is or would be presumed[3] to be "acting in concert[4]" with, the shareholder providing the Shareholder Notice.

C. The number of shares of Corporation common stock owned by each shareholder described in (A) or (B).

D. The number of shares of Corporation common stock as to which each shareholder described in (A) or (B) has the power to vote or dispose of.

E. A materially complete description of any arrangement or understanding between any shareholder described in (A) or (B) and any individual nominated for election as director in such Shareholder Notice, pursuant to which the nominated individual is proposed to be elected or to serve.

F. With respect to any shareholder described in (A) or (B), and any individual named as a director nominee in the Shareholder Notice, a statement as to whether such individual has been, within the preceding five years, the subject of any action or event described in 17 CFR Section 230.506(d) and a materially complete description of such action or event.

G. With respect to any shareholder described in (A) or (B), and any individual named as a director nominee in the Shareholder Notice, a statement as to whether such individual has been convicted[5] of a "covered offense[6]" and a materially complete description of the facts underlying such conviction.

H. With respect to any individual named as a director nominee in the Shareholder Notice the information described in 17 CFR Section 240.14a-101, Item 7.

I. A materially complete description of any substantial interest, direct or indirect, by security holdings or otherwise, of the shareholder providing the Shareholder Notice, and any shareholder described in (A) or (B), in any matter described in the Shareholder Notice, other than election as a director.

These onerous requirements serve one purpose and one purpose only. To make it more difficult for shareholders to remove and replace directors, notwithstanding their absolute right to do – with or without cause – enshrined in the Articles of Incorporation.

14

83787191;6

**I. Derivative Action.** This action is brought pursuant to Federal Rule of Civil Procedure 23.1 and Florida Statute 607.0741 *et. seq.* for the benefit of DEF and the other shareholders of Bancshares. DEF acquired its shares in Bancshares, and therefore indirectly in Bank, in December 2024, and has continuously held shares through the present day. Currently, DEF owns 108,900 shares of common stock, making it the single largest shareholder. Bancshares and Bank are nominal defendants, as opposed to nominal plaintiffs, because the management and board of each nominal defendant are antagonistic to DEF and its efforts to ensure the retention of directors and senior management with the experience necessary to comply with the OCC Operating Agreement. *See Liddy v. Urbanek* 707 F.2d 1222 (11th Cir. 1983); *Whitten v. Clarke*, 41 F.4th 1340 (11th Cir. 2022).

Formal demand to bring this action has not been made upon the corporation. Such demand is not required pursuant to Florida Statute 607.0742 because: (i) the demand would be futile given that each and every current member of the board of directors of Bancshares and Bank are named as defendants herein; and (ii) Bancshares and Bank will suffer material and irreparable injury because Bank is currently in default of its obligations to federal regulators creating a substantial risk of further OCC action, which can include cease and desist orders, fines and penalties, and other mandated action.

## IV. <u>MEMORANDUM OF LAW</u>

The prerequisites for granting a preliminary injunction are well-established: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) that

83787191;6

the movant will suffer irreparable injury if injunctive relief is not granted; (3) that the threatened injury to the movant outweighs the potential harm to the opposing party; and (4) that issuance of injunctive relief would not be adverse to the public interest. *See*, *e.g.*, *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1561 (11th Cir. 1989); *JPMorgan Chase Bank, N.A. v. Ben-Ezra & Katz, P.A.,* 2011 WL 1458066, 1 (S.D. Fla. 2011). As shown below, the facts before the Court meet each of these requirements; therefore, DEF is entitled to expedited injunctive relief.

## A.    DEF Has a Substantial Likelihood of Success on the Merits.

By its Verified Complaint, Plaintiff seeks, *inter alia,* injunctive relief to redress Defendants' breaches of fiduciary duties. As detailed throughout this memorandum, the Director Defendants breached both the duty of care and the duty of loyalty imposed by Florida law.

**1. Duty of Care.** Under applicable Florida law, directors owe a fiduciary duty of care to act in good faith, and in the best interests of the corporation. Fla. Stat. 607.0830 (1). The duty of care requires directors to discharge their duties with the care that an ordinary and prudent person in a like position would reasonably believe appropriate under similar circumstances and in a manner that is in the best interests of the corporation. *In re Aqua Clear Technologies, Inc.*, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007); *Taubenfeld v. Lasko*, 324 So.3d 529, 538 (Fla. 4th DCA 2021). The duty of care includes the obligation of oversight and requires each director to become reasonably informed about issues facing the corporation before taking any action including considering all material information reasonably available in making business

16

decisions. Fla. Stat. 607.0830 (2); *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 749 (Del. Ch. 2005).[11]

The Director Defendants have undoubtedly breached the duty of care owed to the shareholders and the Bank. Specifically, the Director Defendants have acted willfully, recklessly, in a grossly negligent manner, and with a conscious disregard for the corporation's interest by failing to be reasonably informed before taking numerous actions including, but not limited to: (1) providing cannabis-related banking services without understanding the complex regulatory structure and regulations governing such banking services; (2) soliciting cannabis-related banking by proclaiming Pasco Bank as the first federally regulated bank in the United States to provide loans to companies operating in the cannabis industry, when the reality is, the Bank lacked sufficient personnel and protocols to comply with applicable banking laws, rules, regulations and guidance; (3) continuing to solicit and provide cannabis-related banking services after it was readily apparent that the Bank did not have the proper directors or guardrails in place to comply with applicable regulations and guidance imposed by federal regulations; (4) failing and refusing to add qualified directors, senior managers and compliance officers with the knowledge necessary to comply with the complex regulations and guidance imposed by federal regulators; and (5) failing to

---

[11] The court in *Taubenfeld* recognized that "Florida courts may look to the law of Delaware for guidance in establishing their own corporate doctrines." 324 So.3d at 538, n.1.

17

comply with the terms of the OCC Operating Agreement, instead choosing to protect their own interests as the expense of the Banking Defendants.

The Director Defendants' reckless and misguided entry into cannabis-related banking without the necessary management in place, and without a sufficient understanding of the complex regulatory framework resulted in the Bank being investigated and examined by the OCC, and a finding that the bank engages in unsafe and unsound banking practices. That behavior resulted in the imposition of detailed requirements imposed by the OCC Operating Agreement – requirements with which, upon information and belief, Defendants have failed to timely comply and which have cost the Bank hundreds of thousands or millions of dollars.

This is a clear breach of the Director Defendants' fiduciary duty of care.

**2. Breach of Duty of Loyalty.** The Director Defendants also owe a fiduciary duty of loyalty to the Bank and its shareholders to act in good faith, in the best interest of the corporation, and to place the interests of the corporation above their own self-interest. *Id.*; *777 Partners LLC v. Pagnanelli*, 2023 WL 11965485, \*17 (S.D. Fla. July 17, 2023) (holding that Florida recognizes two fundamental fiduciary duties: the duty of care and loyalty; further holding that self-dealing constitutes breaches of fiduciary duty of care and loyalty); *Taubenfeld*, 324 So.3d at 538-540 (holding that while the duty of care and loyalty are distinct duties, the same conduct can violate both duties); *Disney* 907 A.2d at 751 (duty of loyalty mandates that the "best interest of the corporation and its shareholders take [ ] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

18

83787191;6

Here, the Director Defendants breached their fiduciary duty of loyalty by acting in bad faith and to the detriment of the corporation to protect and preserve their own positions as directors of the Board of Bancshares and Bank. The Director Defendants sought to protect their board seats to maintain control and continue receiving the corresponding compensation and benefits associated therewith. A facial review of the Directors' background and experience makes clear that the Director Defendants lacked the requisite experience to enter the cannabis-related banking space, as do the findings and obligations now imposed by the OCC Operating Agreement.

Yet, as explained in Section III H, *supra*, the Director Defendants deliberately chose to put their own self-interests above that of the Bank and the shareholders by (i) refusing to add qualified senior management and directors to the Board as suggested by the Bank's largest shareholder; (ii) *unlawfully* amending the bylaws to protect their board positions against shareholder action to remove and replace them, and (iii) upon information and belief, failing to comply with the provisions of the OCC Operating Agreement mandating the retention of independent senior management and directors with the relevant experience.

The efforts to protect their positions at the expense of the Bank is a clear breach of the Director Defendants' duty of loyalty.

**3. The Business Judgment Rule does not Absolve the Director Defendants' Conduct.** The business judgment rule does not provide a safe harbor to insulate the Director Defendants from liability stemming from their blatant breaches of fiduciary

duty. Florida's business judgment rule is codified at Fla. Stat. § 607.0831, under which a director faces liability, if the "director breached or failed to perform his or her duties as a director" and, *inter alia*, (i) the director derived an improper personal benefit, (ii) acted with conscious disregard for the best interests of the corporation, or (iii) engaged in willful or intentional misconduct.

> The business judgment applies only when a business is operating according to a reasonable business model. The question is whether directors followed a reasonable process and made an informed business judgment. But the rule is not intended to serve as a shield for those who have acted in their own personal self-interest.

*Disorbo v. American Van Lines, Inc*. 354 So.3d 530, 545 (Fla. 4th DCA 2023) (internal citations omitted).

The actions described herein, including (a) engaging in cannabis-related banking services without regard to applicable federal regulations, leading to federal regulators finding "unsafe and unsound banking practices," (b) protecting their board positions at the expense of the Bank and its shareholders, by unlawfully amending bylaws to prohibit shareholder action to remove them, and (c) failing to comply with the mandates imposed by the OCC Operating Agreement to bring in new management and directors, so as to protect their positions and compensation associated therewith, all militate against the application of the business judgment rule.

The case of *Bancor Group Inc. v. Rodriguez*, Case # 22-20201, 2023 WL 4972881 (S.D. Fla. July 5, 2023) (report and recommendation, adopted on all relevant points at 2023 WL 6441904) is directly on point. Like the instant case, a shareholder in a bank brought a derivative claim against the bank's directors alleging that the directors

20

83787191;6

acted in their own self interest, by, among other things, seeking to protect their own compensation. Also like the instant case, the bank was subject to an OCC Consent Order finding unsafe and unsound banking practices, and the complaint alleged that directors failed to comply with the OCC order to protect their own self interest at the expense of the bank. Finding that "admissible evidence exists in the record to prove that Defendants have managed the Bank in a way that served their own financial and/or political interests at the expense of the Bank . . . Defendants' argument regarding the applicability of the business judgment rule is unpersuasive" at the summary judgment phase. *Id*. at *2.

As such, the business judgment rule does not immunize the Director Defendants from personal liability.

**B.    The Bank And Shareholders will Suffer Irreparable Harm Absent an Injunction**

The Director Defendants' current conduct and breach of their fiduciary duties of loyalty and care has caused and will continue to cause irreparable harm to the Bank and the shareholders absent the Court granting the requested injunctive relief. The Bank is on a current path toward self-destruction. Under the current leadership, the Bank has ventured into providing cannabis-related banking services that it is woefully ill-equipped to offer, has found itself subject to several lawsuits and the target of an OCC enforcement action that has costs hundreds of thousands of dollars if not more, resulted in the imposition of onerous requirements that the Bank must comply with or risk suffering additional significant fines and penalties and potentially a forced sale.

83787191;6

Per the OCC Operating Agreement, the Bank was subject to strict deadlines of November 10 and December 10, 2025, both of which, on information and belief, came and out went without compliance. The costs associated with the lawsuits and OCC investigation, coupled with findings of unsafe and unsound banking practices, reduced the value of the bank and correspondingly the value to the shareholders. The threat posed by the Director Defendants continued refusal to hire new management and directors, unlawfully preventing shareholders from taking formal action to remove and replace and continued failure to comply with OCC requirements just to protect their own self-interest poses additional irreparable harm for which there is no adequate remedy at law.

Given that the current Director Defendants have made it abundantly clear that they will not sacrifice their current leadership position for the betterment of the Bank and its shareholders, no matter what the OCC says, the Bank and its shareholders will suffer irreparable harm absent the requested relief.

**C.    The Balance of the Harms Weighs in Favor of Granting Injunctive Relief**

The balance of harms weighs heavily in favor of granting an injunction. On Plaintiff's side of the scale, you have a shareholder who is trying to protect shareholder value for all shareholders and ensure that the Bank complies with its statutory and regulatory obligations. Comparatively, on the Director Defendants side, you have individuals who are willing to deny shareholders their statutory rights to oversee directors, and risk fines, suspensions and penalties and other regulatory action simply to ensure that they do not lose their director (or officer) seat or add directors to the

22

83787191;6

Board which may dilute their vote. When comparing the balance of harms, the only harm that the Director Defendants could ultimately suffer is the inability to further their self-interest at the expense of the Bank, while Plaintiff seeks to protect the continued viability of the Bank and its shareholders interests. As such, the Court should grant the injunctive relief requested herein.

**D.    Public Interest Supports an Injunction**

Public interest supports injunctive relief. Shirking fiduciary duties and putting your own self-interests above the best interests for the company and shareholders does not in any way promote or support the public's interest at large. Moreover, failing to comply with federal regulators mandates in not in the public interest. Rather, public interest supports the idea that directors ought to be serving in their role to benefit the company and to promote shareholder value, particularly for federally chartered banking institutions. Thus, the Court should find this factor weighs in favor of granting injunctive relief.

**E.    Only A Nominal Bond Should be Required**

Given the little potential of harm that the Director Defendants face if an injunction is issued, a minimal bond in the amount of $10,000 is sufficient. The Director Defendants' only potential harm is their inability to continue to unlawfully promote their self-interests above those of the Bank and the shareholders. The requested relief serves the Bank, and the shareholders poses little to no risk to the Director Defendants, thus a $10,000 bond is more than sufficient.

23

83787191;6

## V. CONCLUSION

WHEREFORE, Plaintiff DEF Trading, LLC hereby requests that the Court enter a preliminary injunction: (i) requiring Defendants to forthwith comply with the provisions of the OCC Operating Agreement relating to the retention of qualified management and directors;   (ii) prohibiting Defendants from enforcing the unlawful amendment to bylaws impeding the shareholders from removing and replacing the recalcitrant Director Defendants; (iii) declaring the Article II, Sections 13 and 14 of the Second Amended and Restated Bylaws of Florida Banchares, Inc. to be unenforceable; (iv) prohibiting the Director Defendants from selling the Bank or its assets absent Court or shareholder approval, (v) prohibiting the Director Defendants from taking any out of the ordinary course actions that would materially affect shareholder value until the Bank is in full compliance with the OCC Operating Agreement; and (vi) award Plaintiff such further relief the Court deems just and proper.

By: /s/ *Andrew P. Gold*
Andrew P. Gold, Esq.
Florida Bar No. 612367
Primary email: andrew.gold@akerman.com
Secondary email: jill.parnes@akerman.com
**AKERMAN LLP**
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, Florida 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

24

83787191;6

John Dicks, Esq.
Florida Bar No. 89012
Primary email: john.dicks@akerman.com
Secondary email:judy.mcarthur@akerman.com
**AKERMAN, LLP**
401 E. Jackson Street
Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that I have reviewed the forgoing Motion and that the factual allegations contained therein are true and correct.

Signed on January 9, 2026

_____
Daniel Fulgham

25

83787191;6