# EXHIBIT A

AGREEMENT BY AND BETWEEN
First National Bank of Pasco
Dade City, Florida
and                                          AA-SO-2025-46
The Office of the Comptroller of the Currency

First National Bank of Pasco, Dade City, Florida ("Bank") and the Office of the

Comptroller of the Currency ("OCC") wish to assure the safety and soundness of the Bank and

its compliance with laws and regulations.

The Comptroller of the Currency ("Comptroller") has found unsafe or unsound

practice(s), including those relating to Bank Secrecy Act ("BSA") / Anti-Money Laundering

("AML") risk management and suspicious activity reporting, and violation(s) of law, rule, or

regulation, including 12 C.F.R. § 21.11 (Suspicious Activity Reports) and 31 C.F.R. § 1010.610

(Due diligence programs for correspondent accounts for foreign financial institutions).

Therefore, the OCC, through the duly authorized representative of the Comptroller, and

the Bank, through its duly elected and acting Board of Directors ("Board"), hereby agree that the

Bank shall operate at all times in compliance with the following:

## ARTICLE I

## <u>JURISDICTION</u>

(1)     The Bank is an "insured depository institution" as that term is defined in

12 U.S.C. § 1813(c)(2).

(2)     The Bank is a national banking association within the meaning of 12 U.S.C.

§ 1813(q)(1)(A), and is chartered and examined by the OCC. *See* 12 U.S.C. § 1 *et seq.*

(3)     The OCC is the "appropriate Federal banking agency" as that term is defined in

12 U.S.C. § 1813(q).

## ARTICLE II

## <u>COMPLIANCE COMMITTEE</u>

(1)    Within sixty (60) days of the date of this Agreement, the Board shall appoint a Compliance Committee of at least three (3) members, of which a majority shall be directors who are not employees, officers, or controlling shareholders of the Bank or any of its subsidiaries or affiliates, or family members of any such person. The Board shall submit in writing to the Assistant Deputy Comptroller ("ADC") the names of the members of the Compliance Committee within ten (10) days of their appointment. In the event of a change of the membership, the Board shall submit in writing to the ADC within ten (10) days the name of any new or resigning committee member. The Compliance Committee shall monitor and oversee the Bank's compliance with the provisions of this Agreement. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)    Within ninety (90) days of the date of this Agreement, and thereafter within thirty (30) days after the end of each quarter, the Compliance Committee shall submit to the Board a written progress report setting forth in detail:

(a)    a description of the corrective actions needed to achieve compliance with each Article of this Agreement;

(b)    the specific corrective actions undertaken to comply with each Article of this Agreement; and

(c)    the results and status of the corrective actions.

(3)    Upon receiving each written progress report, the Board shall forward a copy of the report, with any additional comments by the Board, to the ADC within ten (10) days of the first Board meeting following the Board's receipt of such report.

## ARTICLE III

### BOARD OVERSIGHT AND CORPORATE GOVERNANCE

(1)      Within ninety (90) days of the date of this Agreement, the Board shall adopt a written program to provide the overall direction, oversight, and corporate governance of the Bank ("Board Oversight and Corporate Governance Program").

(2)      The Board Oversight and Corporate Governance Program shall, at a minimum, include:

     (a)      the Bank's risk appetite and risk limits;

     (b)      Board-established strategic goals and objectives supported by analysis and projections;

     (c)      procedures to monitor management's implementation of Board-established goals and objectives;

     (d)      the retention of, at all times, a qualified Chief Executive Officer ("CEO") and senior management team, including President, Chief Financial Officer, and Chief Lending Officer;

     (e)      a management and Board succession plan designed to promote adequate staffing and continuity of capable management and oversight, to include action plans for events that could require replacement of key positions prior to desired readiness;

     (f)      a process to periodically evaluate the Bank's CEO and senior management to determine whether their knowledge and expertise are appropriate for the Bank's strategy, complexity, and risk profile;

3

(g)   oversight of senior management's compensation and benefits, to include at a minimum:

(i)   a process for Board review and decisioning for any senior management level employment contracts;

(ii)   establishment of formal performance standards for senior management consistent with the Bank's strategy, risk appetite and culture, and risk management practices; standards must balance prudent risk-taking and reward and promote effective remediation of audit and regulatory issues;

(iii)   verification that senior management receives annual performance evaluations and that the results of such reviews, including determinations about the achievement of predetermined objectives, are considered in the decision about their total compensation and benefits;

(iv)   establishment of compensation and benefits for the CEO that considers Board-established goals and objectives and the performance standards required by paragraph (2)(g)(ii) of this Article; and

(v)   annual review to confirm that incentive compensation arrangements and aggregate Bank compensation levels are safe and sound; such review must include appropriate analysis using industry comparative data to support senior management

4

compensation that is market-based, reasonable, proportionate to job duties and performance, and considers the Bank's condition;

(h)    proper lines of authority, reporting responsibilities, and delegation of duties for all officers;

(i)    a comprehensive conflict of interest and insider lending policy applicable to the Bank's directors, principal shareholders, executive officers, affiliates, and employees ("Insiders") and related interests of such Insiders;

(j)    procedures to ensure the Bank complies with applicable laws and regulations for affiliate transactions;

(k)    procedures to ensure the Bank complies with the requirements of 12 C.F.R. § 5.51 for changes in directors and senior executive officers, if applicable, as well as the restrictions in 12 C.F.R. Part 359 for golden parachute payments, if applicable, and indemnification payments;

(l)    procedures to ensure the Board receives and reviews sufficient Bank information from management (including scope, frequency and content) on the operation of the Bank to enable it to provide proper oversight and fulfill its fiduciary duties and other responsibilities under the law;

(m)    risk management (including audit) and compliance management systems suitable for the Bank's size and activities;

(n)    procedures to ensure the Board monitors the Bank's operations and performance;

5

(o)    procedures to ensure the Board periodically reviews and approves the

Bank's Bank Secrecy Act/Anti-Money Laundering compliance program;

(p)    procedures to ensure the Board holds management accountable for

accurate and complete reporting to the Board and for taking and retention

of appropriate Board and committee meeting minutes;

(q)    procedures to ensure the Bank maintains adequate internal controls and

assigned accountability to monitor and hold management accountable for

adherence to Bank policies and procedures;

(r)    processes to ensure that management responds to audit, compliance, and

regulatory criticisms with a written action plan that contains corrective

actions to be taken, deadlines for taking the corrective action, and the

individual(s) responsible for making the corrective action;

(s)    procedures to ensure that Bank employees may anonymously report

concerns of inappropriate behavior, misconduct, policy violations,

operational problems, or other risks to the Bank; and that such concerns

will be independently reviewed and escalated as appropriate;

(t)    requirements for each individual Board member to provide active and full

participation in the oversight of the affairs of the Bank and avoid giving

significant deference to any senior executive officer or Board member;

and

(u)    procedures for the Board to periodically evaluate the size, composition,

expertise, and independence of the Board, as well as individual Board

6

member participation and contributions, with additions or other changes to the Board, as appropriate.

(3)     Upon adoption of the Board Oversight and Corporate Governance Program, Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Board Oversight and Corporate Governance Program and any amendments thereto. The Board shall review the effectiveness of the Board Oversight and Corporate Governance Program at least annually, and more frequently if necessary or if required by the OCC in writing, and amend the Board Oversight and Corporate Governance Program as needed or directed by the OCC. The Board shall forward a copy of the adopted Board Oversight and Corporate Governance Program, and any subsequent amendments thereto, to the ADC within ten (10) days of adoption.

## ARTICLE IV

## STRATEGIC AND CAPITAL PLANNING

(1)     Within ninety (90) days of the date of this Agreement, the Board shall submit to the ADC for review and prior written determination of no supervisory objection an acceptable revised written strategic plan for the Bank, covering at least a three (3) year period ("Strategic Plan"). The Strategic Plan shall establish objectives for the Bank's overall risk profile, earnings performance, growth, balance sheet mix, off-balance sheet activities, liability structure, capital and liquidity adequacy, and product line development, and market segments that the Bank intends to promote or develop, together with strategies to achieve those objectives, and shall, at a minimum, include:

(a)     a mission statement that forms the framework for the establishment of strategic goals and objectives;

7

(b)    the strategic goals and objectives to be accomplished, including key financial indicators, risk tolerances, and realistic strategies to improve the overall condition of the Bank; the Bank's risk tolerances must incorporate any new products, services, or activities, consistent with the requirements of paragraph (1)(k) of this Article;

(c)    a risk profile that evaluates credit, interest rate, liquidity, price, operational, compliance, and strategic risks in relation to capital;

(d)    an assessment of the Bank's strengths, weaknesses, opportunities and threats that impact its strategic goals and objectives;

(e)    an evaluation of the Bank's internal operations, staffing requirements, board and management information systems, policies, and procedures for their adequacy and contribution to the accomplishment of the strategic goals and objectives developed under paragraph (1)(b) of this Article;

(f)    a realistic and comprehensive budget that corresponds to the Strategic Plan's goals and objectives;

(g)    a financial forecast to include projections for significant balance sheet and income statement accounts and desired financial ratios over the period covered by the Strategic Plan;

(h)    a detailed description and assessment of major capital expenditures required to achieve the goals and objectives of the Strategic Plan;

(i)    an identification and prioritization of initiatives and opportunities, including timeframes that comply with the requirements of this Agreement;

8

(j)     a description of the Bank's target market(s), competitive factors in its identified target market(s), and controls systems to mitigate risks in the Bank's target market(s);

(k)     an identification and assessment of the present and planned product lines (assets and liabilities) and the identification of appropriate risk management systems to identify, measure, monitor, and control risks within the product lines;

(l)     concentration limits commensurate with the Bank's strategic goals and objectives and risk profile;

(m)     assigned roles, responsibilities, and accountability for the strategic planning process; and

(n)     a description of systems and metrics designed to monitor the Bank's progress in meeting the Strategic Plan's goals and objectives.

(2)     If the Bank's Strategic Plan outlines a proposed sale or merger of the Bank, including a transaction pursuant to 12 U.S.C. § 215a-3, the Strategic Plan shall, at a minimum, address the steps that shall be taken and the associated timeline to effect the implementation of that alternative.

(3)     Within sixty (60) days following the Board's receipt of the ADC's written determination of no supervisory objection to the revised Strategic Plan or to any subsequent update or amendment to the Strategic Plan, the Board shall adopt and Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Strategic Plan. The Board shall review the effectiveness of the Strategic Plan and update the Strategic Plan to cover the next three (3) year period at least annually, and more

9

frequently if necessary or if required by the OCC in writing. The Board shall amend the Strategic

Plan as needed or directed by the OCC.  Any update or amendment to the Strategic Plan must be

submitted to the ADC for review and prior written determination of no supervisory objection.

(4)	Until the Strategic Plan required under this Article has been submitted by the

Bank for the ADC's review, has received a written determination of no supervisory objection

from the ADC, and has been adopted by the Board, the Bank shall not significantly deviate from

the products, services, asset composition and size, funding sources, structure, operations,

policies, procedures, and markets of the Bank that existed immediately before the effective date

of this Agreement without first obtaining the ADC's prior written determination of no

supervisory objection to such significant deviation.

(5)	The Bank may not initiate any action that significantly deviates from a Strategic

Plan (that has received written determination of no supervisory objection from the ADC and has

been adopted by the Board) without a prior written determination of no supervisory objection

from the ADC.

(6)	Any request by the Bank for prior written determination of no supervisory

objection to a significant deviation described in paragraphs (4) or (5) of this Article shall be

submitted in writing to the ADC at least sixty (60) days in advance of the proposed significant

deviation. Such written request by the Bank shall include an assessment of the effects of such

proposed change on the Bank's condition and risk profile, including a profitability analysis and

an evaluation of the adequacy of the Bank's organizational structure, staffing, management

information systems, internal controls, and written policies and procedures to identify, measure,

monitor, and control the risks associated with the proposed change.

(7)     For the purposes of this Article, changes that may constitute a significant deviation include, but are not limited to, a change in the Bank's markets, marketing strategies, products and services, marketing partners, underwriting practices and standards, credit administration, account management, collection strategies or operations, fee structure or pricing, accounting processes and practices, asset composition and size, or funding strategy, any of which, alone or in the aggregate, may have a material effect on the Bank's operations or financial performance; or any other changes in personnel, operations, or external factors that may have a material effect on the Bank's operations or financial performance.

(8)     Within thirty (30) days after the end of each quarter, a written evaluation of the Bank's performance against the Strategic Plan shall be prepared by Bank management and submitted to the Board. Within thirty (30) days after submission of the evaluation, the Board shall review the evaluation and determine the corrective actions the Board will require Bank management to take to address any identified shortcomings. The Board's review of the evaluation and discussion of any required corrective actions to address any identified shortcomings shall be documented in the Board's meeting minutes. Upon completion of the Board's review, the Board shall submit to the ADC a copy of the evaluation as well as a detailed description of the corrective actions the Board will require the Bank to take to address any identified shortcomings.

(9)     Within ninety (90) days of the date of this Agreement, the Board shall submit to the ADC for review and prior written determination of no supervisory objection an acceptable revised written capital plan for the Bank, consistent with the Strategic Plan required by Paragraph (1) of this Article, covering at least a three (3) year period ("Capital Plan"). Refer to

11

"Capital and Dividends" booklet of the Comptroller's Handbook. The Bank's Capital Plan shall, at a minimum:

(a)    identify and evaluate all current and future material risks to capital;

(b)    determine the Bank's capital needs in relation to material risks and strategic direction;

(c)    identify and establish a strategy to maintain capital and strengthen capital if necessary and establish a contingency or back-up capital plan commensurate with the Bank's overall risk and complexity; the contingency plan(s) should quantify additional sources of capital and establish minimum triggers to obtain additional capital;

(d)    include detailed quarterly financial projections which shall be consistent with the Strategic Plan required by Paragraph (1) of this Article; and

(e)    include specific plans detailing how the Bank will comply with restrictions or requirements set forth in this Agreement that will have an impact on the Bank's capital.

(10)    Within sixty (60) days following receipt of the ADC's written determination of no supervisory objection to the Bank's Capital Plan or to any subsequent amendment to the Capital Plan, the Board shall adopt and Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Capital Plan. The Board shall review the effectiveness of the Capital Plan at least annually, no later than January 31 each year, and more frequently if necessary or if required by the OCC in writing, and amend the Capital Plan as needed or directed by the OCC. Any amendment to the Capital Plan

12

must be submitted to the ADC for review and prior written determination of no supervisory objection.

(11)    At least monthly, the Board shall review financial reports and earnings analyses that evaluate the Bank's performance against the goals and objectives established in the Capital Plan, as well as the Bank's written explanation of significant differences between the actual and projected balance sheet, income statement, and expense accounts, including a description of any extraordinary and/or nonrecurring items. This review shall include a description of the actions the Board and management will take to address any deficiencies. At least quarterly, management shall prepare, and the Board shall review, a written evaluation of the Bank's performance against the Capital Plan, which shall include a description of the actions the Board and management will take to address any deficiencies. The Board's monthly reviews and quarterly written evaluations shall be documented in the Board meeting minutes. The Board shall retain a copy of these monthly reviews and Board meeting minutes and shall forward a copy of these quarterly written evaluations and Board meeting minutes to the ADC within ten (10) days of completion of its quarterly written evaluations.

## ARTICLE V

## DIRECTORS AND SENIOR EXECUTIVE OFFICERS

(1)    Prior to the appointment of any individual to a position of "senior executive officer," as defined in 12 C.F.R. § 5.51(c)(4), or the appointment of any individual to the Board, the Bank shall submit to the ADC for review and prior written determination of no supervisory objection the name, resume, any background reviews required by Bank policy, and such other information about the individual as the ADC may request.

13

(2)    The ADC shall have the power to not provide a prior written determination of no supervisory objection to any proposed senior executive officer or director. However, a prior written determination of no supervisory objection to the proposed individual shall not constitute an approval or endorsement of the proposed individual.

(3)    Notwithstanding the requirements of paragraph (1) of this Article, the Bank may request that one or more individuals assume positions of senior executive officer or director on an interim basis by submitting such request, in writing, to the ADC. If the ADC grants the Bank's request, then the proposed individual or individuals may assume the specified position or positions on an interim basis. Thereafter, within thirty (30) days, the Bank shall submit to the ADC the information required by paragraph (1) of this Article. If the Bank fails to submit such information within thirty (30) days, then the proposed individual(s) shall resign his/her/their position(s). The ADC may waive any or all of the submission requirements.

**ARTICLE VI**

**BSA/AML OFFICER AND STAFFING**

(1)    Within ninety (90) days of the date of this Agreement, the Board shall ensure that the Bank maintains, at all times, a qualified BSA Officer vested with sufficient independence, authority, and resources to fulfill the duties and responsibilities of the position and ensure compliance with the requirements of the Bank Secrecy Act and its implementing regulations. The BSA Officer shall provide timely and accurate periodic reporting to the Board and senior management about the status of the Bank's BSA/AML program, including compliance with the BSA and this Agreement, including the BSA/AML Action Plan.

(2)    In the event that the Bank's BSA Officer position is vacated, the Board shall promptly appoint a new BSA Officer. Prior to appointing a new BSA Officer, the Board shall

14

obtain the OCC's written determination of no supervisory objection to appoint the individual as BSA Officer. The process the Bank shall follow for obtaining a no supervisory objection under this Article shall be the same process described in Article V pertaining to Directors and Senior Executive Officers.

(3)     The Board shall ensure that the Bank has sufficient staff with appropriate skills and expertise needed to support the BSA Officer and the Bank's BSA/AML program and that such staff is vested with sufficient authority to fulfill their respective duties and responsibilities.

(4)     Within ninety (90) days of the date of this Agreement, and no less than annually thereafter, the Board shall review the adequacy of the Bank's BSA Officer and supporting staff and shall document its determinations in writing. The review shall evaluate and consider the effectiveness of the following:

(a)     the leadership, knowledge, training, and skills of the BSA Officer and staff;

(b)     the oversight and governance structures for BSA staff, including whether the Board and Bank management have the necessary knowledge to effectively oversee the Bank's compliance with the BSA; and

(c)     the level of manual and automated processes in the BSA/AML compliance function and the staffing levels for the BSA/AML compliance function, consistent with the Bank's money laundering, terrorist financing, and other illicit financial activity risk assessment, including anticipated risks from new or expanded lines of business, products, and services, and the effectiveness of the Bank's BSA/AML program.

Upon completion, this review must be submitted to the ADC.

15

(5)     Within sixty (60) days after completing the assessment under paragraph (4) of this Article, the Board shall ensure that the Bank implements any changes that are needed in the Bank's BSA Officer and supporting staff, including their responsibilities, authority, structure, independence, competencies, or capabilities. In particular, the Board shall ensure that the BSA Officer and supporting staff have sufficient training, authority, resources, and skill to perform their assigned responsibilities. The Board shall further ensure that it and Bank management have the necessary knowledge to effectively oversee the Bank's compliance with the BSA and that management information systems are effective. The Board shall also ensure that there are clear lines of authority and responsibility for the Bank's BSA/AML compliance function and staff.

## ARTICLE VII

## BSA/AML INTERNAL CONTROLS

(1)     Within ninety (90) days of the date of this Agreement, the Board shall adopt a written program of policies and procedures to identify and control the risks associated with money laundering and terrorist financing and other illicit financial activity, and to achieve and maintain compliance with the BSA ("BSA/AML Internal Control Program"). Refer to the *FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual*: "BSA/AML Internal Controls" (Rev. March 2020).

(2)     The Bank's BSA/AML Internal Control Program shall include, at a minimum:

        (a)     detailed, accurate documentation of personnel roles and responsibilities;

        (b)     procedures for periodically updating the Bank's money laundering, terrorist financing and other illicit financial activity BSA risk assessments to cover the risks associated with current, or subsequently proposed, Bank

16

products, services, customers, entities, and geographies served, and including the dollar volume, number, and countries associated with Bank products, services, customers, and transactions;

(c)     appropriate risk-based transaction limits for Bank products and services, consistent with the Bank's risk appetite and ongoing testing to ensure that customers and staff comply with Bank-imposed and legal requirements applicable to those transactions;

(d)     requirements for periodic independent validation of the models and filtering thresholds used for the BSA/AML monitoring systems to ensure that all accounts and transactions are captured, and the systems are adequate to detect potentially suspicious activity;

(e)     policies and procedures for investigating and responding to transactions identified as posing greater than normal risk for compliance with the BSA with well-documented dispositions of alerts from any source, including, but not limited to, an automated monitoring system, Bank employee referrals, and law enforcement inquires;

(f)     procedures to ensure accurate and timely filing of suspicious activity reports ("SAR") and currency transaction reports ("CTR") that comply with FinCEN's filing instructions in accordance with 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.306;

(g)     effective management information systems, commensurate with the Bank's size and risk profile, that provide timely and accurate periodic written reports to management and the Board of the status of the Bank's

17

BSA/AML Program, including, but not limited to, trends in SAR and other filings, alert and investigation volumes, and compliance with the BSA and this Order; and

(h)    procedures for performing Customer Due Diligence and Risk Identification as detailed in Article VIII of this Agreement and for performing Suspicious Activity Monitoring as detailed in Article IX of this Agreement.

(3)    Upon adoption of the Bank's BSA/AML Internal Control Program, Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Bank's BSA/AML Internal Control Program. The Board shall review the effectiveness of the Bank's BSA/AML Internal Control Program at least annually, and more frequently if necessary or if required by the OCC in writing, and amend the Bank's BSA/AML Internal Control Program as needed or directed by the OCC. The Board shall forward a copy of the adopted BSA/AML Internal Control Program, and any subsequent amendments thereto, to the ADC within ten (10) days of adoption.

## ARTICLE VIII

## CUSTOMER DUE DILIGENCE AND RISK IDENTIFICATION

(1)    Within ninety (90) days of the date of this Agreement, the Board shall adopt a written customer due diligence program to ensure appropriate collection and analysis of customer information when opening new accounts, when renewing or modifying existing accounts for customers, and when the Bank obtains event-driven information indicating that it would be prudent to obtain updated information in order to understand the nature of its customer relationships and generate and maintain an accurate customer risk profile ("CDD Program"). The

18

CDD Program shall also ensure the Bank operates in accordance with applicable law and regulations, including regulations addressing Customer Identification Program ("CIP") requirements under 31 C.F.R. § 1020.220, CDD, and beneficial ownership, and be consistent with the Bank's money laundering, terrorist financing and other illicit financial activity risk assessment. Refer to the *FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual*: "Customer Due Diligence" (Rev. May 2018).

    (2)    The Bank's CDD Program shall include, at a minimum:

        (a)    clear definitions of the Bank's customer risk rating categories that provide appropriate distinctions between each risk rating;

        (b)    a methodology for assigning defined risk levels to the customer base that considers the customer's entire relationship and appropriate factors such as type of customer; purpose of the account; geographic location; and the expected account activity by type of service used, including the volume, velocity, and frequency by dollar amount and number;

        (c)    risk-based requirements to collect, maintain, and update all information necessary to establish an accurate customer risk profile and facilitate ongoing monitoring to identify and report suspicious activity;

        (d)    procedures to ensure the Bank gathers appropriate written CIP information for the opening of new accounts that ensure that the required customer identification information is maintained in compliance with 31 C.F.R. § 1020.220(a)(3);

19

(e)    procedures that contain a clear statement of management's and staff's responsibilities, including procedures, authority, and responsibility for reviewing and approving changes to a customer's risk profile, as applicable;

(f)    procedures to ensure staff responsible for gathering CDD information have sufficient authority, training, and skills to perform their assigned responsibilities;

(g)    procedures for identifying and timely remediating instances where required CDD information is missing or incomplete;

(h)    procedures to maintain an accurate and complete list of moderate and high-risk customers that identifies current customers and accounts exhibiting high-risk characteristics for money laundering, terrorist financing, or other illicit activity;

(i)    procedures for ongoing monitoring and periodic reviews of customers, which shall include, at a minimum:

   (i)    risk-based criteria establishing how often to conduct periodic reviews of low, medium, and high-risk customers;

   (ii)    documented evidence of transactional analysis, including comparing expected, historical, and current activity, the source and use of funds, trends, and activity patterns; and

   (iii)    documented critical analysis of all significant information in the file, including the identification of significant disparities,

20

investigation of high-risk indicators and potentially suspicious
activity, and well-supported conclusions; and

(j)    procedures to ensure that customer risk ratings are appropriately
incorporated into the Bank's money laundering, terrorist financing and
other illicit financial activity risk assessment.

(3)    Upon adoption of the Bank's CDD Program, Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Bank's CDD Program and any amendments thereto. The BSA Officer or another qualified designee must implement training for all applicable staff and the Board on the requirements of the Bank's CDD Program. The Board shall review the effectiveness of the Bank's CDD Program at least annually, and more frequently if necessary or if required by the OCC in writing, and amend the Bank's CDD Program as needed or directed by the OCC. The Board shall forward a copy of the CDD Program, and any subsequent amendments thereto, to the ADC within ten (10) days of adoption.

## ARTICLE IX

## SUSPICIOUS ACTIVITY IDENTIFICATION, EVALUATION, AND REPORTING

(1)    Within ninety (90) days of the date of this Agreement, the Board shall adopt a written suspicious activity monitoring and reporting program to ensure the timely and appropriate identification, review, and disposition of potentially suspicious or unusual activity, and the filing of SARs consistent with 12 C.F.R. § 21.11 ("Suspicious Activity Review Program"). Refer to the *FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual*: "Suspicious Activity Report – Overview" (Rev. Feb. 2015).

(2)    The Bank's Suspicious Activity Review Program shall include, at a minimum:

21

(a)     procedures for identifying, evaluating, and reporting suspicious activity, known or suspected violations of Federal law, violations of the BSA, terrorist financing and other illicit financial activity, or suspicious transactions related to potential money laundering activity across all lines of business, including suspicious activity relating to the opening of new accounts, the monitoring of current accounts, and transactions through the Bank;

(b)     standards for dispositioning different types of alerts that are reasonable, communicated in writing to relevant staff, and are adhered to by Bank staff;

(c)     requirements for the BSA Department staff to consider appropriate Customer Due Diligence ("CDD") information when conducting alert reviews and suspicious activity investigations;

(d)     requirements for the maintenance of adequate documentation to support the disposition of alerts and case investigations;

(e)     procedures for an effective SAR decision-making process that require documenting individual decisions on whether to file SARs and key facts supporting each decision to not file a SAR;

(f)     procedures to ensure SARs are filed timely, completely, and accurately, with a sufficient description of the suspicious activity and the basis for filing;

(g)   procedures for reporting continuing suspicious activity and when to escalate issues or problems to the Board or Bank management identified as the result of repeat SAR filings on customers or accounts;

(h)   ensuring that monitoring systems apply appropriate rules, thresholds and filters for monitoring transactions, accounts, customers, products, services, and geographic areas commensurate with the Bank's BSA/AML risk profile that include:

   (i)   identification of areas outside of the monitoring system's analysis and implementation of manual processes to ensure the Bank identifies potential suspicious activity not reviewed by an automated system;

   (ii)   validation of the data inputs for any automated systems, which shall include inputs from all products, services, and transactions; and

   (iii)   documentation supporting the Bank's methodology for establishing and adjusting thresholds and filters;

(i)   processes for ongoing, risk-based independent validation of alert triggers, parameters, and other settings, including factors for developing a customer risk profile;

(j)   processes for developing adequate documentation and prompt reporting of validation findings and prompt resolution of deficiencies identified during model validation. Refer to "Supervisory Guidance on Model Risk Management," April 11, 2011 (OCC Bulletin 2011-12); "Bank Secrecy

23

Act/Anti-Money Laundering: Interagency Statement on Model Risk

Management for Bank Systems Supporting BSA/AML Compliance,"

April 12, 2021 (OCC Bulletin 2021-19); and the "Model Risk

Management" booklet of the *Comptroller's Handbook* for more

information; and

(k)    any backlogs in the suspicious activity monitoring and reporting program

are promptly reported to the Board and management, in writing, for

resolution.

(3)    Upon adoption of the Bank's Suspicious Activity Review Program, Bank

management, subject to Board review and ongoing monitoring, shall immediately implement and

thereafter ensure adherence to the Bank's Suspicious Activity Review Program. The Board shall

review the effectiveness of the Bank's Suspicious Activity Review Program at least annually,

and more frequently if necessary or if required by the OCC in writing, and amend the Bank's

Suspicious Activity Review Program as needed or directed by the OCC. The Board shall forward

a copy of the adopted Suspicious Activity Review Program, and any subsequent amendments

thereto, to the ADC within ten (10) days of adoption.

(4)    Within ninety (90) days of the date of this Agreement, the BSA Officer, subject to

Board review and approval, shall evaluate recommendations from the 2023 third-party report

related to the independent model validation of the Bank's transaction monitoring system ("2023

Report") and develop a written project plan for implementing recommendations from the 2023

Report that are consistent with the Bank's BSA risk profile. The project plan must assign

accountability for each finding and designate timeframes for completion. The BSA Officer and

24

Board must also document recommendations from the 2023 Report that will not be implemented

and include a written rationale that supports that decision.

## ARTICLE X

### BSA/AML INDEPENDENT TESTING

(1)    Within ninety (90) days of the date of this Agreement, the Board shall adopt a

written BSA/AML independent testing program ("BSA/AML Audit Program") to test the

Bank's compliance with the BSA, relative to its risk profile, and the overall adequacy of the

Bank's BSA/AML compliance program. Refer to the *FFIEC Bank Secrecy Act/Anti-Money*

*Laundering Examination Manual*: "BSA/AML Independent Testing" (Rev. March 2020).

(2)    The BSA/AML Audit Program shall address and determine, at a minimum,

whether:

(a)    the Bank's money laundering, terrorist financing and other illicit

financial activity risk assessment adequately captures its risk profile;

(b)    the policies, procedures, and processes for BSA/AML compliance are

appropriate for the Bank's risk profile;

(c)    the Bank adheres to its policies, procedures, and processes for BSA/AML

compliance;

(d)    the Bank's policies and procedures are reasonably designed to achieve

compliance with the BSA and its implementing regulations;

(e)    the Bank's overall process for identifying and reporting suspicious activity

is adequate to comply with regulatory requirements;

(f)    the Bank's information technology sources, systems, and processes used

to support the BSA/AML compliance program are adequate;

25

(g)     BSA/AML training is provided for appropriate personnel, tailored to

specific functions and positions, and includes supporting documentation;

and

(h)     management took appropriate and timely action to address any

deficiencies previously noted by audit staff.

(3)     Upon adoption of the Bank's BSA/AML Audit Program, Bank management, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Bank's BSA/AML Audit Program. The Board shall review the effectiveness of the Bank's BSA/AML Audit Program at least annually, and more frequently if necessary or if required by the OCC in writing, and amend the Bank's BSA/AML Audit Program as needed or directed by the OCC. The Board shall forward a copy of the adopted BSA/AML Audit Program, and any subsequent amendments thereto, to the ADC within ten (10) days of adoption.

(4)     Management shall require prompt reporting of all deficiencies in BSA/AML processes and controls identified through the BSA/AML Audit Program to the Bank's Board or BSA/AML Audit Committee, and to senior management. The reports shall indicate the severity of the deficiencies, the risks, and the required corrective actions. The Board or BSA/AML Audit Committee shall ensure that management takes prompt action to remedy deficiencies cited in audit reports and that the BSA/AML Audit Program reviews and validates corrective action promptly.

## ARTICLE XI

## <u>GENERAL BOARD RESPONSIBILITIES</u>

(1) The Board shall ensure that the Bank has timely adopted and implemented all corrective actions required by this Agreement, and shall verify that the Bank adheres to the corrective actions and they are effective in addressing the Bank's deficiencies that resulted in this Agreement.

(2) In each instance in which this Agreement imposes responsibilities upon the Board, it is intended to mean that the Board shall:

(a) authorize, direct, and adopt corrective actions on behalf of the Bank as may be necessary to perform the obligations and undertakings imposed by this Agreement;

(b) ensure that the Bank has sufficient processes, management, personnel, control systems, and corporate and risk governance to implement and adhere to all provisions of this Agreement;

(c) require that Bank management and personnel have sufficient training and authority to execute their duties and responsibilities pertaining to or resulting from this Agreement;

(d) hold Bank management and personnel accountable for executing their duties and responsibilities pertaining to or resulting from this Agreement;

(e) require appropriate, adequate, and timely reporting to the Board by Bank management of corrective actions directed by the Board to be taken under the terms of this Agreement; and

27

(f)     address any noncompliance with corrective actions in a timely and appropriate manner.

## ARTICLE XII

## OTHER PROVISIONS

(1)     As a result of this Agreement, the Bank is not:

(a)     precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 5, unless the Bank fails to meet any of the requirements contained in subparagraphs (1) – (4) of 12 C.F.R. § 5.3, Definitions, Eligible bank or eligible savings association, or is otherwise informed in writing by the OCC;

(b)     subject to the restrictions in 12 C.F.R. § 5.51 requiring prior notice to the OCC of changes in directors and senior executive officers or the limitations on golden parachute payments set forth in 12 C.F.R. Part 359, unless the Bank is otherwise subject to such requirements pursuant to 12 C.F.R. § 5.51(c)(7)(i) or (iii); and

(c)     precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 24, unless the Bank fails to meet any of the requirements contained in 12 C.F.R. § 24.2(e)(1)-(3) or is otherwise informed in writing by the OCC.

(2)     This Agreement supersedes all prior OCC communications issued pursuant to 12 C.F.R. §§ 5.3, 5.51(c)(7)(ii), and 24.2(e)(4).

28

## ARTICLE XIII

## CLOSING

(1)  This Agreement is intended to be, and shall be construed to be, a "written agreement" within the meaning of 12 U.S.C. § 1818, and expressly does not form, and may not be construed to form, a contract binding on the United States, the OCC, or any officer, employee, or agent of the OCC. Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the OCC may enforce any of the commitments or obligations herein undertaken by the Bank under its supervisory powers, including 12 U.S.C. § 1818(b)(1), and not as a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the OCC has any intention to enter into a contract. The Bank also expressly acknowledges that no officer, employee, or agent of the OCC has statutory or other authority to bind the United States, the U.S. Treasury Department, the OCC, or any other federal bank regulatory agency or entity, or any officer, employee, or agent of any of those entities to a contract affecting the OCC's exercise of its supervisory responsibilities.

(2) This Agreement is effective upon its issuance by the OCC, through the Comptroller's duly authorized representative. Except as otherwise expressly provided herein, all references to "days" in this Agreement shall mean calendar days and the computation of any period of time imposed by this Agreement shall not include the date of the act or event that commences the period of time.

(3) The provisions of this Agreement shall remain effective and enforceable except to the extent that, and until such time as, such provisions are amended, suspended, waived, or terminated in writing by the OCC, through the Comptroller's duly authorized representative. If the Bank seeks an extension, amendment, suspension, waiver, or termination of any provision of

29

this Agreement, the Board or a Board-designee shall submit a written request to the ADC asking for the desired relief. Any request submitted pursuant to this paragraph shall include a statement setting forth in detail the special circumstances that warrant the desired relief or prevent the Bank from complying with the relevant provision(s) of the Agreement, and shall be accompanied by relevant supporting documentation. The OCC's decision concerning a request submitted pursuant to this paragraph, which will be communicated to the Board in writing, is final and not subject to further review.

(4) The Bank will not be deemed to be in compliance with this Agreement until it has adopted, implemented, and adhered to all of the corrective actions set forth in each Article of this Agreement; the corrective actions are effective in addressing the Bank's deficiencies; and the OCC has verified and validated the corrective actions. An assessment of the effectiveness of the corrective actions requires sufficient passage of time to demonstrate the sustained effectiveness of the corrective actions.

(5) Each citation, issuance, or guidance referenced in this Agreement includes any subsequent citation, issuance, or guidance that replaces, supersedes, amends, or revises the referenced cited citation, issuance, or guidance.

(6) No separate promise or inducement of any kind has been made by the OCC, or by its officers, employees, or agents, to cause or induce the Bank to enter into this Agreement.

(7) All reports, plans, or programs submitted to the OCC pursuant to this Agreement shall be forwarded, by overnight mail or via email, to the following:

ADC LaTisha Boyd                    *with a copy to:*  ADC Analyst Mitchell Johnson

(8) The terms of this Agreement, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his duly authorized representative, has hereunto set her signature on behalf of the Comptroller.

/s/
_____

LaTisha Boyd
Assistant Deputy Comptroller
Tampa Office

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of First National Bank of Pasco have hereunto set their signatures on behalf of the Bank.

/s/
_____    9/11/25
Stephen D. Carle                                Date

/s/
_____    9-11-25
Ander (A.P.) Gibbs                              Date

/s/
_____    9-11-25
John E. Henson                                  Date

/s/
_____    9-11-25
Marlene H. Mann                                 Date

/s/
_____    9-11-25
Paul P. Midili                                  Date

/s/
_____    9/18/2025
Paula O'Neil                                    Date

/s/
_____    9-11-25
Ernest L. Peeples                               Date

32