UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEF TRADING, LLC,

Case No. 8:25-cv-02996-SDM-CPT

Plaintiff,

v.

FLORIDA BANCSHARES, INC. and FIRST NATIONAL BANK OF PASCO as nominal defendants and ANDER PLATT GIBBS, JOHN HENSON, PAUL MIDILI, ERNEST PEEPLES, MARLENE MANN, STEVEN CARLE, AND PAULA S. O'NEIL,

Defendants.
_______________________________/

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Plaintiff, DEF Trading, LLC, ("DEF") files this Opposition to Defendants' Motion to Dismiss ("Motion"; Doc 28).

**INTRODUCTION**

The board of directors ("Board") of the First National Bank of Pasco ("Bank") and its parent – Florida Bancshares, Inc. ("Bancshares") – repeatedly ignored their duty to oversee the Bank as it dove headfirst into the complex field of cannabis-related banking. The Board had no experience in the field, sought no qualified individuals, and took no other action to ensure regulatory compliance. Even after the Bank's regulator, the U.S. Treasury Office of the Comptroller of the Currency ("OCC"), investigated the Bank and found unsafe and unsound banking practices and other

serious regulatory violations, the Board did nothing. Even after regulators took action against the Bank via an OCC Operating Agreement, compelling sweeping changes to ensure compliance, the Board did nothing. Even after DEF, a significant shareholder of Bancshares,[1] offered help by identifying qualified individuals to assist with compliance, the Board did nothing.

DEF, recognizing the potential devasting consequences of the OCC investigation, began soliciting shareholder written consents to replace the unqualified board members and stop the Board's stonewalling. In response, the Board purported to amend Bancshares' bylaws to remove the ability to act by shareholder written consent – in violation of Florida law – and added additional bylaws facially designed to stymie any effort to replace the Board. Thus, DEF was forced to bring this action asserting derivative claims for breach of fiduciary duty and direct claims for declaratory judgment regarding the legal effect of the purported amended bylaws.

Now, Defendants file a Motion to Dismiss, insisting (1) DEF had to demand the Board sue themselves before filing this action, (2) the specific numbered paragraphs in Count I do not allege a breach of fiduciary duty, (3) the claim for declaratory judgment is unripe until DEF proceeds with a complicated and expensive consent solicitation that is expressly barred by the amended bylaws at issue in this case, and (4) DEF cannot seek injunctive relief without a viable claim for breach of fiduciary duty. Defendants' arguments are cursory and unavailing. The Complaint

[1] Upon information and belief, Bancshares is the ultimate beneficial owner of 100% of the stock in the Bank.

demonstrates demand would be futile in light of the specific breaches and entrenchment action of the Board, Count I states a claim for breach of the duty of both care and loyalty, Count II is ripe, and Count III is viable because Count I is viable. Thus, the Court should deny the Motion in its entirety.

## BACKGROUND

By way of summary, the Verified Complaint ("Complaint") (Doc. 1) alleges the following facts. DEF is a shareholder of Nominal Defendant Bancshares, which owns Nominal Defendant, Bank. Compl. ¶¶ 5, 70. The individual Defendants – Ander Platt Gibbs, John Henson, Paul Midili, Ernest Peeples, Marlene Mann, Steven Carle, and Paula S. O'Neil (collectively defined above as, the "Board") – comprise the entire board of both Bancshares and the Bank. *Id.* ¶¶ 6-12, 28.

No member of the Board has any apparent experience with banking regulation, let alone regulation of cannabis-related banking. *Id.* ¶¶ 6-12. Given the complex and shifting legal status of marijuana, cannabis-related banking is subject to substantial federal oversight, and banks involved in cannabis-related banking must comply with specific regulations to satisfy anti-money laundering obligations and suspicious activity reporting requirements. *Id.* ¶¶ 14-18.

Notwithstanding the regulatory complexities and the Board's inexperience with same, the Bank began soliciting cannabis-related banking business in 2022. *Id.* ¶ 19. The Board and the Bank falsely held themselves out as experienced in cannabis electronic payments and "signed a series of processing agreements" with various

companies for the specific purpose of processing cannabis transactions and engaging in other cannabis-related banking. *Id.* ¶¶ 20-21.

In reality, the Bank and the Board did not have any protocols to ensure compliance with federal regulations when engaging in cannabis-related banking. *Id.* ¶ 22. Nor did the Board hire officers, directors, or other personnel with sufficient relevant experience to ensure compliance with the federal regulation of cannabis-related banking. *Id.* To the contrary, the Bank "faced a revolving door" in its CEO/President position, which is now held by Defendant Paula S. O'Neil, the former Pasco County Clerk of Court. *Id.* ¶ 29.

The Board did nothing to address the glaring gaps in the Bank's compliance capability. *Id.* ¶ 27. As a result, the OCC, the Bank's primary regulator, began investigating it and its payment-processor affiliates in 2024. *Id.* ¶ 23. The Bank estimated that the cost of an independent "lookback" as part of the investigation cost the Bank more than $1 million. *Id.* ¶ 25.

The OCC determined the Bank was engaged in "unsafe or unsound practice(s)" and violated federal regulations under the Bank Secrecy Act, anti-money laundering risk management, and suspicious activity reporting. *Id.* ¶ 26. As a result, the Bank executed an "OCC Operating Agreement,"[2] which was signed by every member of the

[2] An OCC Operating Agreement is an informal bank enforcement action encompassed by a written agreement within the meaning of, and enforceable pursuant to the terms of, 12 USC 1818. *See* OCC Policies and Procedures Manual PPM 5310-3 (May 25, 2023), n.8. https://www.occ.gov/news-issuances/bulletins/2023/ppm-5310-3.pdf. Accordingly, failure to comply with the OCC Operating Agreement can lead to

Board. *Id.,* Ex. B. The OCC Operating Agreement requires, *inter alia*, (1) creation of a compliance committee, the majority of which are "independent directors," (2) "the retention of . . . a qualified CEO, CFO and Chief Lending Officer," (3) a management and board succession plan, (4) retention of a qualified CEO and senior management team, (5) OCC approval of any director or "senior executive officer," and (6) creation of various specific procedures designed to ensure management independence and compliance with federal banking regulations. *Id.* ¶ 34. In short, the OCC Agreement requires a complete overhaul of the Bank's oversight and management. *Id.* ¶ 35.

The Board has ignored the OCC Agreement, which was signed on September 11, 2025, and generally requires compliance in ninety days or earlier. *Id.* ¶¶ 37-38. Notably, the Board has expressly stated it will not replace O'Neil as CEO/President despite a clear obligation to do so under the OCC Agreement. *Id.* ¶ 39. To assist the Board, DEF proposed a list of names for consideration as independent directors or senior management candidates. *Id.* ¶ 40. But the Board ignored this proposal and has not otherwise appointed or hired qualified individuals. *Id.* ¶ 41.

Alarmed by the OCC investigation and the Bank Defendants' inability to respond, DEF began soliciting shareholder approval of a written consent to remove one or more of the unqualified Board members and replace them with experienced candidates. *Id.* ¶ 52. Action by written shareholder consent is expressly authorized

---

termination of the Bank's status as an insured depository institution. 12 USC 1818(a)(2).



84939683;2

under Florida law, Bancshares' Articles of Incorporation, and (at the time) Bancshares' bylaws. *Id.* ¶ 55-58.

When the Board learned of DEF's written consent solicitation, however, they promptly amended Bancshares' bylaws (the "Amended Bylaws"). *Id.* ¶ 54, Ex. C. The Amended Bylaws purport to remove the right of shareholders to act without a shareholder meeting, quintuple the ownership interest necessary to call a shareholder meeting, and create burdensome prerequisites thereto. *Id.* ¶¶ 55-63. The Amended Bylaws are a facial attempt to frustrate shareholder action to replace the Board and senior management. *Id.* ¶ 59.

As a result of the Board's misconduct, including the unenforceable Amended Bylaws, DEF brought this action. Count I asserts a derivative claim for breach of fiduciary duty against every member of the Board. *Id.* ¶¶ 77-81. The Complaint alleges how the Board breached their duties of care and loyalty, *id.* ¶¶ 42-63; how the Bank and Bancshares were injured by the alleged breaches, *id.* ¶¶ 64-68; and DEF's standing to assert the derivative claims, *id.* ¶¶ 69-73. Specifically, the Complaint alleges that pre-suit demand was not required under Florida Statute 607.0742 because it would be futile in light of the allegations against each and every member of the Board. *Id.* ¶ 73.

Count II requests a declaratory judgment regarding DEF's rights as a shareholder with respect to the Amended Bylaws. *Id.* ¶¶ 82-100. And Count III sets out the basis for DEF's request for injunctive relief with respect to Count I. *Id.* ¶¶ 101-106.

Defendants now move to dismiss each count. *See generally* Motion. But none of their arguments support dismissal: (1) the Complaint demonstrates demand futility and otherwise satisfies the procedural requirements of a derivative action, (2) Count I states a claim for breach of fiduciary duty, (3) Count II's request for a declaratory judgment is ripe, and (4) Count III's request for injunctive relief is viable because Count I is viable. Accordingly, the Motion should be denied.

## ARGUMENT

### I. THE COMPLAINT DEMONSTRATES DEMAND FUTILITY

The Complaint adequately alleges DEF's authority to assert derivative claims without first asking the Board to sue themselves. Addressing only the specific numbered paragraphs under the heading "Derivative Allegations," Defendants argue the Complaint must be dismissed because it fails to allege with particularity that demand to the Board would be futile. But this argument ignores the extensive factual allegations demonstrating that demand would be futile because the entire Board breached its fiduciary duties and specifically acted to entrench itself by impairing shareholders' ability to act.

The Motion identifies only two decisions purportedly supporting the challenge to demand futility. *See* Motion at 6-7 (citing *Long v. Odland*, 2012 WL 13019034 (S.D. Fla. Aug. 15, 2012); *Story v. Kang*, 2006 WL 163078 (M.D. Fla. Jan. 20, 2006)). Neither decision assesses the factual allegations here.[3]

[3] Moreover, both decisions analyze a company governed by Delaware law, not Florida law. *See Story*, 2006 WL 163078, at *1 ("Because [the Company] is a Delaware

Pre-suit demand in a derivative action is futile if the Complaint alleges facts that "create a reasonable doubt" whether the board "as constituted at the time of this action's filing could consider with prudent disinterest a demand based on the merits of the amended complaint." *Story*, 2006 WL 163078, at *2. To this end, *Long* and *Story* both dismiss derivative claims in the absence of allegations showing "that a *majority* of the Board was not disinterested and not independent." *Long*, 2012 WL 13019034, at *8 (emphasis added); *Story*, 2006 WL 163078, at *3. Indeed, the complaint was dismissed in *Long* because it did not "allege[] the number of non-Defendant directors on the Board or identify them." 2012 WL 13019034, at *8. And the complaint was dismissed in *Story* because it alleged insider trading by specific individuals but failed to allege that a majority of the board was interested in the challenged transactions. 2006 WL 163078, at *2-3.

This action does not concern a transaction that benefited one or two board members. To the contrary, the Complaint alleges with specificity how the <u>entire</u> Board breached their duty of care by failing in their duty of oversight, and breached their duty of loyalty by amending the bylaws to thwart shareholder action in direct violation of Florida statutes. These allegations of continued failure to act in the face of information

corporation, Delaware law properly governs the court's substantive analysis of [the defendant's] 'demand futility' argument.") (internal citation omitted); *accord Long*, 2012 WL 13019034, at *4 (assessing derivative pleading requirement "[u]nder Delaware law"). Nonetheless, courts applying Florida law borrow Delaware law for purposes of assessing demand futility and other corporate governance issues. *See Bancor Grp. Inc. v. Rodriguez*, 2022 WL 2916857, at *7 (S.D. Fla. June 14, 2022), *rep. & rec. adopted in relevant part*, 2022 WL 2915887.

necessitating action is sufficient to raise doubt whether the board could consider a demand with prudent disinterest and thus demonstrates demand futility. *See In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) (applying Delaware law and finding demand futility where complaint alleged the entire board willfully refused to address illegal conduct brought to their attention by the FDA).

Contrary to Defendants' assertion, the Complaint shows far more than "generalized assertions about compensation or self-interest" and does not simply assert that the Board approved a suspect transaction to retain their compensation. *See* Motion at 7 (citing *Long*, 2012 WL 13019034, at *8; *Story*, 2006 WL 163078, at *2-3). Instead, the Complaint demonstrates that the Board sought to infringe shareholder statutory rights for the specific purpose of maintaining their board positions – a classic example of board entrenchment. Compl. ¶¶ 54-63.

"A struggle for corporate control" carries "the inherent presumption of director self-interest associated with such a contest." *Grobow v. Perot*, 539 A.2d 180 (Del. 1988) (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)). As such, demand is futile where a complaint "alleges an entrenching activity that directly impairs the shareholders' voting rights." *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1189 (Del. Ch. 1998) ("The complaint in this case alleges in a particularized way that the [company's] directors acted for entrenchment purposes. Under our case law, that is sufficient to excuse the requirement of a demand.").

The Complaint alleges precisely such entrenching activities. After learning DEF was soliciting shareholder approval for a consent solicitation "to remove one or more

of the unqualified directors," the Board responded by purporting to amend Bancshares' bylaws to (1) remove shareholder action by written consent entirely, (2) require 51% ownership to call a shareholder meeting, and (3) require substantial additional information before a shareholder meeting can be called – particularly information about contemplated director nominees. Compl. ¶¶ 51-62. These purported amendments have no legitimate business purpose and could only serve as "an entrenching activity that directly impairs the shareholders' voting rights." *Carmody*, 723 A.2d at 1189.

In short, the Complaint provides particular facts demonstrating, in two different ways, that demand was futile. The Complaint should not be dismissed.

## II. DEF STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY

The same allegations showing demand futility also state a claim against each member of the Board for breach of fiduciary duty in Count I. Despite these extensive factual allegations, however, Defendants insist Count I fails to state a claim and should be dismissed under Rule 12(b)(6). Motion at 8. The Motion devotes only a single paragraph to this argument; it should be rejected in equally swift fashion.

As with the demand-futility argument, Defendants' Rule 12(b)(6) argument myopically addresses the specific numbered assertions in Count I but glaringly ignores the preceding factual allegations that are expressly incorporated. Motion at 8 (citing Compl. ¶¶ 78-80); *see* Compl. ¶ 77. Defendants complain that the allegations showing a breach of fiduciary duty "'are detailed' elsewhere" in the Complaint, but they do not dispute the existence of those allegations. Motion at 8.

A complaint states a claim if it provides "a short and plain statement … showing that the pleader is entitled to relief" and providing "the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007) (citation altered). Here, the Complaint alleges in detail how the Defendants completely failed in their duty of oversight to implement systems and hire personnel to ensure compliance with detailed cannabis related banking regulations prior to venturing into the business, and failing to retain qualified personnel even after it became apparent that it did not have any systems in place to ensure compliance with federal regulations. That states an actionable breach of fiduciary duty. In *Marchand II v. Barnhill,* 212 A.3d 805 (Del. 2019), the Delaware Supreme Court explained:

> Under *Caremark* and this Court's opinion in *Stone v. Ritter*, directors have a duty "to exercise oversight" and to monitor the corporation's operational viability, legal compliance, and financial performance. A board's "utter failure to attempt to assure a reasonable information and reporting system exists" is an act of bad faith in breach of the duty of loyalty. (*Id.* at 809, citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch.1996) and *Stone v. Ritter* 911 A.2d 362 (Del. 2006).
>
> * * *
>
> Bad faith is established, under *Caremark*, when "the directors [completely] fail[ ] to implement any reporting or information system or controls[,] or ... having implemented such a system or controls, consciously fail[ ] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it. *Id* at 821.

*See also, In re Boeing Company Derivative Litigation,* C.A. 2019-0907, 2021 WL 4059934, *25 (Del. Ch. Sept. 7, 2021) (complaint stated Caremark claim against Boeing's

directors for failure "to put in place a reasonable board-level system of monitoring and reporting . . . that would allow directors to know about and prevent wrongdoing that could cause loss of the Company").

The Complaint also details how the board sought to entrench themselves by unlawfully deleting shareholders' statutory right to act by written consent in lieu of a shareholder meeting, and then doubled down on that wrongdoing by creating onerous conditions precedent to allow a shareholder to call a special meeting of shareholders. That is a clear breach of fiduciary duty.

Board entrenchment was recognized as a breach of the duty of loyalty in the seminal case of *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437 (Del. 1971). In that case, the board of directors amended corporate bylaws to move up the date of a shareholder meeting and change the place of the meeting to a remote location in an effort to thwart a dissident group of shareholders efforts to remove and replace directors and senior management. The trial court denied the stockholders efforts challenging the board moves, finding that the directors' actions did not run afoul of Delaware's corporate laws for shareholder meetings.[4] The Delaware Supreme Court reversed:

> In our view, those conclusions amount to a finding that management has attempted to utilize the corporate machinery and the Delaware Law for the purpose of perpetuating itself in office; and, to th[a]t end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. These are inequitable purposes, contrary to established principles of corporate democracy. The advancement by directors of the

[4] *Schnell v. Chris-Craft Industries, Inc.* 285 A.2d 430 (Del. Ch. 1971).

> by-law date of a stockholders' meeting, for such purposes, may not be permitted to stand.
> *Id.* at 439.

*Schnell's* progeny has solidified the concept that it is the owners (shareholders) of a corporation that ultimately control the company, and actions by a board to thwart shareholder attempts to remove directors constitute a breach of the duty of loyalty. Moreover, those board actions are not subject to the business judgment rule.

The case of *Blasius Industries, Inc. v. Atlas Corp.,* 564 A.2d 651 (Del. Ch. 1988) is directly on point. In *Blasius*, a 9% shareholder circulated a written consent to expand the board from its existing 7 seats to 15 seats, and electing 8 new members, which would have effectively created a new majority and control of the board. In response, the existing board members amended the company bylaws to immediately add two new members, such that even if the consent solicitation successfully appointed 8 members, the existing directors and those friendly to them, would now have 9 seats, and thereby maintain their majority. The Chancery Court voided the existing board's action, explaining:

> [E]ven though defendants here acted on their view of the corporation's interest and not selfishly, their December 31 action [amending bylaws to ensure they maintained a friendly majority] constituted an offense to the relationship between corporate directors and shareholders that has traditionally been protected in courts of equity. As a consequence, I conclude that the board action taken on December 31 was invalid and must be voided. *Id.* at 652.
>
> [T]he ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context. That is, a decision by the board to act for the primary purpose of preventing the effectiveness of a shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with



84939683;2

> respect to a matter of internal corporate governance. . . . A board's decision to act to prevent the shareholders from creating a majority of new board positions and filling them does not involve the exercise of *the corporation's power* over its property, or with respect to *its* rights or obligations; rather, it involves allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation. . . . Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.
> *Id.* at 659-660.

The Complaint contains sufficient allegations of how the Board members breached his or her duty of care and loyalty by (1) failing to exercise adequate oversight despite clear notice of the need for such oversight and (2) acting to entrench themselves in response to DEF's attempts to alter the Board. *E.g.*, Compl. ¶¶ 42-63. These factual allegations are sufficient to apprise the Board of the claims against them and state a claim for breach of fiduciary duty. Count I states a claim and should not be dismissed.

## III. THE DECLARATORY JUDGMENT CLAIM IS RIPE

The Complaint alleges a ripe controversy between DEF and the Board regarding DEF's ability to solicit shareholder action through written consent. Compl. ¶¶ 82-100. That controversy warrants a declaratory judgment.

In arguing that Count II must be dismissed, Defendants demand far too much of the ripeness doctrine in a declaratory judgment action. Motion at 8-9. Defendants suggest Count II is ripe only if DEF first secures a shareholder consent – even though such action is directly prohibited by the adopted Amended Bylaws – presents that

consent to the Board, and then has the Board reject the written consent has prohibited by the Amended Bylaws. *Id.* at 9. That defeats the very purpose of the Declaratory Judgment Act and is foreclosed by the Supreme Court precedent cited in the Motion. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 131 (2007) (party need not breach a contract before requesting declaratory judgment).

A request for declaratory judgment is ripe so long as "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties that have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (internal quotation omitted). *See also, G&M Estates USA, Inc. v. Indian Harbor Ins. Co.*, Case No. 2:23-cv-842, 2024 WL 3226747, *2 (M.D. Fla. June 28, 2024) ("the ultimate question is whether the facts alleged, under all of the circumstances, show there is a substantial controversy, between the parties have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). DEF's claim more than satisfies this standard.

DEF was in the process of soliciting a shareholder consent – as was its right under Florida law and Bancshares' articles of incorporation – when the Board purported to amend the bylaws to expressly remove that shareholder consent right. Compl. ¶¶ 55-57. As demonstrated in the preceding section, such action is subject to being declared void. Defendants suggest DEF is compelled to pursue its consent solicitation, even though that action is expressly prohibited by the Amended Bylaws. Obtaining written consents through solicitation of shareholders in a public company is a complicated and expensive process. DEF is not required to expend those funds in

a futile effort. That is exactly the purpose of declaratory judgment actions. *See, Cas. Indem. Exch. v. High Croft Enterps., Inc.*, 714 F. Supp. 1190, 1194 (S.D. Fla. 1989) ("the purpose behind the Declaratory Judgment Act is to afford a new form of relief from uncertainty and insecurity with respect to rights"). Defendants' demand that DEF exercise its rights before clarifying them would vitiate the foundational purpose of a declaratory judgment.

Accordingly, the claim for a declaratory judgment is ripe and should not be dismissed.[5]

## IV. DEF STATES A VIABLE REQUEST FOR INJUNCTIVE RELIEF

Finally, because the Complaint states a viable claim for breach of fiduciary duty, the request for injunctive relief should not be dismissed. The Motion's challenge to Count III rests exclusively on Defendants' prior challenges to Count I. *See* Motion at 10. But the challenges to Count I fail for the reasons discussed above. *Supra* §§ I-II. As such, Defendants' challenges to Count III must also fail. Count III should not be dismissed.

[5] Similarly, Defendants' suggestion that they cannot determine whether Count II is asserted directly or derivatively ignores the relevant allegations and, more importantly, does not justify dismissal. Motion at 9-10. Count II is plainly asserted directly: it alleges DEF's position, injury, and controversy. Compl. ¶¶ 90-97. Conversely, Count I is plainly asserted derivatively: it alleges duties owed "to Bancshares and Bank" and alleges injury to "Plaintiff and each similarly situated shareholder." Compl. ¶¶ 78-81.

## CONCLUSION

For the reasons stated in this Response, DEF alleges its authority to assert derivative claims without making a pre-suit demand and otherwise states viable claims for relief. Defendants' Motion should be denied.

Date: January 20, 2026

Respectfully submitted,

By: */s/ Andrew P. Gold*

Andrew P. Gold, Esq.
Florida Bar No. 612367
Primary email: andrew.gold@akerman.com
Secondary email: jill.parnes@akerman.com
**AKERMAN LLP**
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, Florida 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

John Dicks, Esq.
Florida Bar No. 89012
Primary email: john.dicks@akerman.com
Secondary email:judy.mcarthur@akerman.com
**AKERMAN, LLP**
401 E. Jackson Street
Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837